Commonwealth ex rel. Haller *v.* Hanna, Appellant.

Argued November 14, 1950. Before HIRT, RENO, DITHRICH, ROSS and ARNOLD, JJ. (RHODES, P. J., and GUNTHER, J., absent).

*Luther C. Braham,* with him *John N. Gazetos, Lee C. McCandless,* and *Galbreath, Braham & Gregg,* for appellants.

*Willis A. MacDonald,* with him *A. R. Cingolani,* for appellee.

OPINION BY ROSS, J., January 12, 1951:

In this habeas corpus proceeding the custody of Judith Jinkner, now aged 7 years and 10 months, is being sought by her mother, Mrs. Gayle Haller, and by Mrs. Haller's mother, Mrs. Lillie B. Hanna and her husband, Captain William R. Hanna.

The cause was tried in the Court of Common Pleas of Butler County on September 5, 1949, and an order was entered on November 12, 1949, awarding custody to the Hannas until the end of the school year, at which time the child was to be sent to live permanently with her mother and step-father in Washington, D.C. The order provided that in the meantime Judith spend school vacations with her mother, and there was compliance with this phase of it. Toward the close of the school year Mrs. Hanna and her husband (hereinafter referred to as the grandparents) presented a petition for an opening of the order of November 12, 1949. On June 12, 1950, the court granted a rule on the mother to show cause why the order should not be opened and the case reconsidered "in the light of facts and circumstances that have arisen since the original hearing and Order of Court". After hearing, the trial judge, on June 29, 1950, affirmed the order allowing the mother permanent custody of the little girl "in time to enter public school at the fall term", and the grandparents have appealed from this affirmance.

The natural parents are divorced, and each has since remarried. Gayle Haller (then Jinkner), after separation from the child's father, Albert Jinkner, in 1944, went to the home of her mother and step-father in Washington, Pennsylvania, taking with her her then one-year-old daughter Judith. In the fall of 1944 Captain Hanna was transferred to Butler, where he is in charge of the Pennsylvania State Police barracks, and Gayle and Judith Jinkner moved with them and continued to reside with them. Mrs. Jinkner (now Haller) obtained employment at Deshon Hospital, and the care of the child during the hours her mother was at work was left to the grandmother. In August 1948, difficulties developed between Captain Hanna and Mrs. Jinkner, which resulted in the latter's withdrawal from the Hanna home. She moved to Washington, D.C., where she obtained employment, leaving Judith with her grandparents. Arrangements were made whereby the $40-a-month maintenance for the child, voluntarily provided by her natural father, was turned over to the Hannas. After divorcing Jinkner, the mother in June 1949 married Captain Ralph Haller of the Medical Department of the U.S. Army, stationed in Washington, D.C. The Hallers then made an effort to have Judith come to live with them but were unsuccessful, Captain Hanna ejecting Mrs. Haller from his home in July 1949, and Mrs. Haller instituted these proceedings.

No question is raised as to the moral fitness of either of the parties to have custody of the child, nor as to financial ability or willingness to furnish a good home for her. On cross-examination, Captain Haller testified that he considered the surroundings under which the child is now living "more than adequate" but in reply to the question, "She has everything a girl would want?" answered, "With the exception of the love of a mother." He testified that their home in a large apartment building in Washington is "very comfort-

able", that there are other children living in the building, that there are school and recreational facilities nearby, that he has been in Army service "over 19 years", and felt that his income and future employment are sufficient to care for his wife and Judith, and that he and his wife "even before we were married" contemplated bringing Judith to live with them and have plans for remodeling the apartment to accommodate her, and "if that couldn't be done I would get another home". This testimony was corroborated by the mother.

The attitude of the natural father, Albert Jinkner, is apparent from his testimony: "Q. . . .the mother had given Judith all the care up until the time she went to the Hanna home? A. That's right. Q. . . . did she do all the things any mother could do? A. I believe she did. Q. And during the period of time that you saw your former wife with this child did she and you display love and affection which a child should have? A. Yes, sir. . . . Q. . . . at the last hearing of this case you expressed an opinion that the child's best interests would be served . . . with her mother, her natural mother having her custody . . . A. Yes, sir. Q. Are you of the same opinion today? A. Yes. Q. That should eventually be done? A. Yes. . . . I want the child to get a home, a good parent and some of the love and affection a child should have. I don't want her to have a spoiled personality that I think results from interfering and transferring a child back and forth, which may have happened if I had contested the custody of the child."

The burden is upon appellants to establish that the decree of the court below is, under the evidence, manifestly erroneous or based on a mistake of law. *Com. ex rel. Minnick v. Wilson*, 159 Pa. Superior Ct. 230, 48 A. 2d 27; *Com. ex. rel. Williams v. Price*, 167 Pa. Superior Ct. 57, 74 A. 2d 668. Of course, the paramount

consideration in cases of this nature is at all times the welfare of the child, which includes its physical, intellectual, moral and spiritual well-being, and all other considerations are subordinate. *Com. ex rel. Self v. Self,* 153 Pa. Superior Ct. 443, 34 A. 2d 263; *Com. ex rel. George v. George,* 167 Pa. Superior Ct. 563, 76 A. 2d 459.

It is well settled in Pennsylvania, ever since the case of *Com. v. Addicks,* 5 Binney 519, that unless compelling reasons appear to the contrary, a child of tender years should be committed to the care and custody of its mother who, in the common experience of mankind, is better fitted to have charge of it, though there are cases where the contrary appears. *Com. ex rel. Keller v. Keller,* 90 Pa. Superior Ct. 357; *Com. ex rel. Gates v. Gates,* 161 Pa. Superior Ct. 423, 55 A. 2d 562; *Com. ex rel. Luchetti v. Luchetti,* 166 Pa. Superior Ct. 530, 72 A. 2d 617. This is true although others who have been suitable custodians of the child have become attached to it. *Com. ex rel. Miller v. Barclay,* 96 Pa. Superior Ct. 315; *Com. ex rel. Lamberson v. Batyko,* 157 Pa. Superior Ct. 389, 43 A. 2d 364; *Com. ex rel. George v. George,* supra, 167 Pa. Superior Ct. 563, 76 A. 2d 459.

While appellants do not directly plead abandonment of the child by her mother, they do so inferentially. Captain Hanna testified, " . . . we have a mother here who I do not believe ever loved this child and tried to learn anything about her." And the grandmother in her testimony, emphasizing that she herself has been left to attend to details of care for the child, said, " . . . the child wasn't getting the affection she needed and then we tried to show her that affection would have to be given to the child". However, in answer to the question on cross-examination, "Didn't she ask to take this child at different times and didn't you refuse that?" she admitted, "Certainly, when she wouldn't be

well and I would think it would be better. Q. And you would refuse it? A. That's right." The grandmother testified further that the mother, in addition to her regular duties at Deshon Hospital, did "Red Cross work and laundry work" at the hospital "on Sunday afternoons"; that she herself put the child to bed but conceded that the mother was there "sometimes" on such occasions. The mother testified: "I saw she was in bed every night. My mother liked to put her to bed and usually she did put her to bed. She wanted to herself but I was usually there and saw she was in bed and went up and told her goodnight."

The mother testified that she took her daughter to Sunday school, where she was a teacher, "every Sunday", and the grandmother corroborated her. Further, "Q. Did you have any place at that time . . . where you and the child could be together and you could care for the child when you were employed? A. No, sir. Q. During the period of time—August 1948 to the present time when you were employed in Washington, did you contribute toward the support of the child? A. I sent clothes, toys and books and at times my mother would use my charge account to buy things the child needed." It is in evidence that she telephoned Judith periodically from Washington.

From this testimony the conclusion is inescapable that the mother's interest in her daughter was not abated during the time she was living in Butler simply because her own mother was the one who ministered to the needs of the child, nor afterward when she lived in Washington, where she at first had no place to keep her. She knew that in her absence her daughter was in good hands. As stated by Judge (now President Judge) RHODES in *Com. ex rel. Lamberson v. Batyko,* supra, 157 Pa. Superior Ct. 389, 391, 43 A. 2d 364: "The fact that the relatrix permitted the child to remain with the grandmother or respondents for a time did not con-

stitute abandonment. It is not uncommon or unusual for a mother to have her child remain with the grandparents or other relatives while she is employed or establishing a home elsewhere." As soon as the mother and her present husband began to plan their marriage, they included in their plans having Judith live with them, and those plans were thwarted only by the reluctance of the grandparents to part with her.

We agree with the learned trial judge when he says that because of the mother's employment "much of the care of this child devolved on Mrs. Hanna . . . but it was a labor of love". The grandparents have been suitable and affectionate custodians, and their attachment for their grandchild has become possessive, but neither of these facts constitutes a "compelling reason" for depriving the mother of custody.

Appellants rely on the statement made by President Judge RHODES, speaking for this Court, in *Com. ex rel. Swartzwelder v. Swartzwelder,* 162 Pa. Superior Ct. 366, 57 A. 2d 610, at page 369, that "her [the natural mother's] right . . . is not absolute; it must yield to the best interest and welfare of the child". In that case, the contest for custody of the child was between the natural parents, and we observed that "relatrix appears to be motivated more by a hostile feeling toward respondent than by a deep-seated concern for the child's present and future welfare". The mother was employed and lived at the home of her aunt and uncle, where she proposed to bring the child to live. She testified on cross-examination: "Q. Isn't it correct that . . . you made the statement . . . that you expected to move away from there? A. That depends. You don't know what Don's work might be." This Court concluded that "the home offered by relatrix may be a precarious one" and "may lack the desirable quality of continuity and stability". The father's home, on the other hand, was established, attractive, in a good neighborhood, and it

appeared that the child was being well cared for and well trained. That is not our case. Here the contest is between natural mother and grandparents; both homes are established and potentially stable.

Both grandparents testified that they did not tell Judith that at the close of the school term she would go to live with her mother in Washington for fear that she would be emotionally disturbed because she allegedly had not enjoyed her Christmas visit there. It is of record that the mother during that visit took her roller skating, sightseeing to the Capitol and Pentagon Building, to movies, to a Chinese restaurant, and taught her to operate an automatic elevator in the apartment building. We agree with the reasoning of the court below with regard to this aspect: "Of what do these respondents complain? Judith spent a few days with her natural mother at her home in Washington, D.C. during the Christmas Holidays. She didn't want to go; she was separated from her playmates; everything new, different surroundings, different method of living. It may be that she did not like it. It would be surprising if it did not take some time to readjust herself."

In reaching our conclusion from our independent study of the record (*Com. ex rel. Lewis v. Tracy,* 155 Pa. Superior Ct. 257, 38 A. 2d 405; *Com. ex rel. Cooper v. Cooper,* 167 Pa. Superior Ct. 492, 75 A. 2d 609), we are not unmindful of the unfortunate circumstance that a change of environment may cause a temporary emotional strain on a young child. However, as Captain Hanna stated in his initial testimony, "Mrs. Hanna and I realize that we will not be here all the child's life", and in our opinion it is preferable that the break be made now rather than later when, because of the bitterness which has been engendered between the parties, she might have become estranged from her mother and readjustment difficulties increased. The

fact that she will be removed to a home outside of this jurisdiction is not controlling. *Com. ex rel. Black v. Black,* 79 Pa. Superior Ct. 409; *Com. ex rel. Miller v. Wagner,* 160 Pa. Superior Ct. 536, 52 A. 2d 235.

We believe that the best interests and permanent welfare of this little girl will be served by awarding her custody to her mother, and find no compelling reasons to the contrary.

Order affirmed.