## Ciammaichella Appeal.

Argued November 26, 1951.  Before DREW, C. J., STERN, STEARNE, BELL, LADNER and CHIDSEY, JJ.

*David Berger,* with him *Leon H. Kline,* for appellants.

*Herbert Mayers,* for appellee.

OPINION BY MR. JUSTICE CHIDSEY, January 7, 1952:

This is an appeal by foster parents from the judgment of the Superior Court affirming the order of the Municipal Court of Philadelphia, sitting as a juvenile court, awarding custody of a minor, Nancy Louise Salemno, to her natural mother.

The appeal was allowed because in our opinion the Superior Court misconceived its reviewing function. The Juvenile Court Law of 1933, June 2, P. L. 1433, Section 16, 11 PS §258, provides: ". . . appeals shall lie as a matter of right to the Superior Court of this Commonwealth, upon the same terms and with the same regulations as are provided by law with respect to appeals from any decree of the orphans' court. In hearing such appeals, the Superior Court shall consider the testimony as part of the record." The Orphans' Court Act of 1917, June 7, P. L. 363, Section 22 [b], 20 PS §2602, provides as follows: "The Supreme and Superior Courts of this Commonwealth shall, in all cases of appeal from the definitive sentence or decree of the orphans' court, hear, try and determine the same as to right and justice may belong, and decree according to the equity thereof; and may refer the same to auditors when, in their discretion, they may think proper."

Despite the broad power thus conferred upon the Superior Court, it held that the scope of its review was limited to ascertaining only whether the lower court had abused its discretion in making its award of cus-

tody. The Superior Court relied on its decision in' *Weintraub Appeal,* 166 Pa. Superior Ct. 342, 71 A. 2d 823, which in turn relied upon the Supreme Court's opinion in *Garrett's Estate,* 335 Pa. 287, 6 A. 2d 858. Whether or not *Garrett's Estate* ruled the determination of the issue presented in *Weintraub Appeal,* it is not controlling here. In *Garrett's Estate* the Supreme Court was confronted only with the refusal of the orphans' court to order the taking of depositions in a foreign country, not with the permanent welfare of a child. This Court held that the procedural matter of taking depositions under the Orphans' Court Act of 1917 was committed to the discretion of the orphans' court, and there was no specific standard by which the exercise of judgment could be tested. Under the Juvenile Court Law of 1933 it is made the duty of the lower court to determine what is for the best interest and welfare of the child. While appeals from the orphans' court may in some instances, as in *Garrett's Estate,* supra, be properly limited to determination whether there has been an abuse of discretion by the lower court, the comprehensive review provided for includes determination as to whether any error, of judgment or otherwise, has been committed. Section 22(b) of the Orphans' Court Act, above quoted, provides that the Supreme and Superior Courts ". . . shall . . . hear, try and determine . . . as to right and justice may belong, and decree according to the equity thereof; . . .". Obviously its scope extends to the fullest review consistent with equitable principles. See *Shelley's Estate,* 288 Pa. 11, 135 A. 740; *McCullough's Estate (No. 2),* 292 Pa. 422, 141 A. 239; *Nimlet's Estate,* 299 Pa. 359, 149 A. 658; *Chadwick Estate,* 154 Pa. Superior Ct. 157, 35 A. 2d 582. Where so important an issue as the welfare of a child is involved, in which the State has a paramount interest, the Superior Court should not

in this case have limited its review but have exercised its independent judgment after consideration of the entire record.

It may be added that where the issue is the custody of a minor, it would be incongruous to limit the review when the issue arises under the Juvenile Court Law but require a full review when it arises under habeas corpus proceedings. It has been repeatedly held in habeas corpus cases involving the custody of a minor that it is the appellate court's duty to examine all the evidence and reach an independent determination. See *Commonwealth ex rel. Lewis v. Tracy*, 155 Pa. Superior Ct. 257, 38 A. 2d 405; *Commonwealth ex rel. Williams v. Price*, 167 Pa. Superior Ct. 57, 74 A. 2d 668; *Commonwealth ex rel. Children's Aid Society, Guardian v. Gard*, 362 Pa. 85, 66 A. 2d 300. No sound distinction can be drawn between the respective provisions for appeal under the Juvenile Court Law and the Habeas Corpus Act of 1917[1] making the scope of review in one more limited than in the other. The paramount interest of the State is the same in either case, namely, the welfare of the child, and an error of judgment by the court below under the Juvenile Court Law can be no less harmful to the State and to the child than under the Habeas Corpus Law.

From the undisputed facts in this litigation—so unfortunately protracted—it appears that Peter Salemno and Betty Salemno, (now Ricci), were married October

---

[1] Act of July 11, 1917, P. L. 817, Section 1 of which, 12 PS §1874 provides: "In all proceedings now pending or hereafter brought any party aggrieved by any order, decree, or judgment in any habeas corpus proceeding, involving the custody of children in any of the courts of this Commonwealth, shall have the right to appeal therefrom to the Superior Court of this Commonwealth, who shall consider the testimony and make such order upon the merits of the case, either in affirmance, reversal, or modification of the order appealed from, as to right and justice shall belong."

9, 1943 and had two children, Donna, born January 21, 1944, and Nancy, born August 8, 1945. The family lived together in Philadelphia. Upon the father's return from military service in March of 1946, he did not join his family and failed to support the children. The mother then took both children to Newark, New Jersey where they lived with her brother and sister-in-law and their child in a four-room apartment. The mother worked, earning $30 a week, and the sister-in-law looked after the two children along with her own child. This proved too burdensome for the sister-in-law. The mother met with the father and demanded support of the children. After an inadequate offer of $6 or $7 a week, it was agreed that the mother should take Donna and support her and the father would take and support Nancy. At this meeting in April of 1946, the father stated his intention to secure a divorce and the mother said she would not contest it. The father placed Nancy in the home of his sister, but because of his failure to make payments for the support of the child, proceedings were instituted which resulted in an order made December 17, 1946 by Judge LINTON of the Juvenile Court which committed Nancy to the custody of the father but further committed her to the Catholic Children's Bureau, and a support order of $7.25 was placed on the father and a similar sum upon the county. Prior to this order by the court, the mother visited Nancy at the home of the father's sister and also had her for two week-ends. After the commitment to the Catholic Children's Bureau, the mother kept in touch with the child through her mother who lived in Philadelphia and visited Nancy every week.

On November 17, 1947 the Catholic Children's Bureau having placed the child in a free home, namely that of Anthony and Laura J. Ciammaichella, (the present appellants), petitioned the court to vacate the

order for support by the father. On December 23, 1947 the petition was granted with direction that Nancy remain under the supervision of the Bureau. Prior to so petitioning the court, the Bureau, in order to clear the way for adoption of the child by the Ciammaichellas, obtained from the father a formal written surrender of his paternal rights as to Nancy. The mother was called to Philadelphia by the Bureau and she signed a similar instrument surrendering her maternal rights. The mother in the meanwhile had married Felix Ricci and they and the older child, Donna, were living at Orange, New Jersey. This marriage by a Methodist minister took place on September 30, 1946 before a final decree in divorce was granted to Peter Salemno.[2] Such decree was granted in July of 1947.

The mother went to Philadelphia in November of 1947 and signed the surrender instrument without the knowledge of her husband, Ricci. Nineteen days thereafter she told her husband and the two of them immediately went to the Associated Catholic Charities in Newark in order to prevent Nancy's adoption. This was confirmed by a supervisor of the Associated Catholic Charities of Newark in a letter written to counsel for the Catholic Children's Bureau in Philadelphia (admitted into evidence by agreement) in which it is stated, "When Mrs. Ricci returned from Philadelphia and told her husband of the transaction, he was very disturbed and regretted that she had not consulted him before she took the step. He assured her that since he

---

[2] When asked to explain why she had married Ricci when she was still married to Salemno, she testified, "My husband applied for a divorce and I got letters about it. He said if I wanted to contest against the divorce I was to appear at such and such a place and time. I don't know the wording of it now but it went that way. I never contested it and appeared in Court. I thought it had taken place . . .".

was taking care of one child, he would be perfectly willing to take care of her sister and that they should both forget about the irresponsibility of Mr. Salemno and concentrate on the welfare of the children. She immediately telephoned the Sisters in West Orange requesting them to nullify her surrender. She believed that the telephone message was sufficient to take care of the matter and she then went ahead with plans to obtain custody of her child." The mother testified that she was told by a representative of the Associated Catholic Charities that she could secure Nancy but it would be necessary to have her marriage ". . . Blessed by the Church and have our other daughter Donna Lou christened and so on so that the house would be Catholic." This apparently required a considerable length of time to conform with the rite of the Catholic Church. In the letter above referred to, written on behalf of the Associated Catholic Charities, which was dated October 29, 1948, it is stated, "During the past year we have been working with Mrs. Ricci. It was necessary for the couple to approach the pastor of their local parish and explain the matter in detail to him. He, in turn, obtained the necessary certificates and finally referred the case to the Chancery Office for clarification. The Chancery Office had the case for a few months and finally advised Fr. Innocent of Our Lady of Mt. Carmel Church, Orange, that the case had been entirely cleared. Fr. Innocent was advised that he could marry Mr. and Mrs. Ricci and baptize Donna Lou. It was only during the past month that the marriage took place and the child was baptized and the home prepared for Nancy Louise." The Catholic marriage took place on October 12, 1948. On December 4, 1948 the mother filed a petition for revocation of the order committing the child to the custody of the Catholic Children's Bureau of Philadelphia, and for the award of its custody to her.

The Ciammaichellas had taken no step toward the adoption of the child. Hearing was allowed on this petition but not held until February 15, 1949. Following the hearing, on March 11, 1949, Judge MILLEN granted the prayer of the petition, discharged Nancy from the custody of the Catholic Children's Bureau and remanded her to the custody of her mother. From this order an appeal with supersedeas was taken to the Superior Court by the Catholic Children's Bureau. Subsequently, however, on August 25, 1949, this appeal was withdrawn and on the same day a petition for rehearing was filed. The foster parents, Anthony and Laura J. Ciammaichella, were allowed to intervene and file a petition in the matter to which an answer was filed.

After various continuances, rehearings were held by Judge MILLEN who on September 7, 1950 affirmed his finding of March 11, 1949 which awarded custody to the mother. On October 23, 1950 the foster parents took an appeal to the Superior Court which on July 19, 1951 handed down its opinion affirming Judge MILLEN, from which the present appeal to this Court was allowed. By an order made August 1, 1951 Judge MILLEN directed that the child be delivered to the mother and since that date Nancy has lived with the Riccis and her sister, Donna, in Maplewood, New Jersey. This home is rented from Mr. Ricci's father. It is a single house in a suburban residential district with sufficient accommodations for all of the family, and considerable ground around it for use by the children in play. Judge MILLEN stated in his opinion that "The independent investigation of this Court discloses that the home is comfortable and adequate and that Mr. Ricci is financially able to fulfill the responsibility of caring for Nancy." It was not disputed that the home of the foster parents, although not as ideal in environment, was adequate and that

while the minor was with them she was well cared for and an affectionate relationship existed. The Ciammaichellas are childless and approaching middle age.

At the rehearing the father, who has remarried, stated that he preferred that "the mother should have the child to raise with the sister". The father neglected both children, took the duties of parenthood very lightly and never manifested any real interest in their welfare so that his desire in the matter is of little, if any weight. The desires of, and attachments formed by any of the parties in interest must be subordinated to what is for the best interests of the child. The Commonwealth is vitally concerned with infants within its boundaries and an interested party in all matters affecting them. The controlling consideration in the disposal of their custody is their own welfare: *Commonwealth ex rel. Graham v. Graham,* 367 Pa. 553, 80 A. 2d 829, and cases cited therein. After examination of the entire record in this case, a careful review of all of the testimony and full consideration of the able briefs and argument by counsel, we have independently arrived at the same conclusion reached by the lower court, that the welfare of this child is best served in the home of her mother and sister.

We find no merit in appellants' contentions that the Juvenile Court was without jurisdiction to make an award of custody and that there was an abandonment of the child by the mother which forfeited any right of custody. The Juvenile Court in the first instance unquestionably had jurisdiction of the minor as a dependent child when it committed it to the Catholic Children's Bureau. While this order, confirmed by its later order of December 23, 1947, was in full force and effect, the minor remained within the jurisdiction of the court. Section 16 of the Juvenile Court Act of June 2, 1933, P. L. 1433, 11 PS §258 provides: "If, at any

time after the final order of any juvenile court placing or committing any dependent, neglected or delinquent child, a change of circumstances has taken place which, in the opinion of the parent or parents or next friend of such child, warrants the revocation or modification of such final order, such child shall, by his or her parent or parents or next friend, have the right to file a petition in such court asking for a revocation or modification of such final order . . .". Appellants would limit the "change of circumstances" as used in this section to a change of circumstances relating to the child and not to the parent. Such construction is not warranted. If the parent or parents of a dependent child become able to and are willing to support the child, surely the Juvenile Court has the right to remand the child to the parental custody. The jurisdiction of the Juvenile Court was not questioned at any stage by any party nor raised by the statement of questions to be argued pursuant to Rule 22. At the hearing of appellee's petition for revocation held on April 27, 1950, counsel for appellants stated of record: "We willingly submit ourselves to your Honor's jurisdiction so that in the best interests of Nancy this litigation might be terminated." The rule that consent cannot give jurisdiction applies only to jurisdiction of the cause of action or subject matter, not to jurisdiction of the person, or jurisdiction based upon procedural matters; as to the latter classes, defects can always be waived: *Commonwealth ex rel. Camp v. Camp,* 150 Pa. Superior Ct. 649, 29 A. 2d 363; *Susquehanna County Auditors' Report (Appeal of Daugherty, et al),* 123 Pa. Superior Ct. 195, 187 A. 78. Here there was jurisdiction of the child.

In their claim of abandonment, appellants rely largely upon a statement in the father's testimony at the original hearing under the mother's petition (when the relations between the two were inimical) that the

mother in July of 1946 left the child on his door-step. A reading of the father's subsequent testimony does not bear out this statement or its heartless implication. The father and mother, as above recited, had agreed in April of 1946 that each would take and support one of the children. The father, who had Nancy, placed her with his sister. He failed to contribute to the child's support and no doubt because of this and because, as the father testified, his sister "didn't have the proper facilities around the house", the father took Nancy to Newark and left her with the mother. As much as the mother may have desired to retain Nancy, it was economically impossible and she could not add to her sister-in-law's burden. Because of this and because of the agreement that the father would support Nancy, after a few days the mother, accompanied by her brother and sister-in-law, returned the child to the father. He testified that he was present when they arrived and that he was unwilling to take the child but that his sister offered to take her again, and apparently did so, because, according to the father, she had the child for approximately nine months in 1946 and, therefore, until the order of commitment was made by the court on December 17, 1946.

Reliance by appellants is also had upon the execution by the mother of the formal surrender, but such an instrument does not irrevocably effectuate an abandonment: *Commonwealth ex rel. Children's Aid Society, Guardian v. Gard,* supra; *Commonwealth ex rel. Berg v. The Catholic Bureau,* 167 Pa. Superior Ct. 514, 76 A. 2d 427. As well stated by Judge HIRT of the Superior Court in the *Berg* case, supra: ". . . A child is not a chattel and therefore cannot be made the subject of a contract by a parent, with the same force and effect as a gift or conveyance, or grant of property, irrevocably or otherwise; the relationship of parent and child is a

status and not a property right; the doctrine of the integrity of written instruments has no materiality and since the welfare of the child is the determining factor, the court in the exercise of its equitable powers may ignore a bargain previously made by a parent in parting with a child; regardless of any gift or contract the court at any time has the power to make such disposition of a minor child, as the circumstances of the case demand, having always in view the best interest of the child. Accordingly, the formal written grant of the infant in this case to respondent by relatrix, though in irrevocable terms, is not binding upon her and in our view is a factor of secondary importance in this dispute over the custody of the child."

Mrs. Ricci went to Philadelphia and signed the surrender without Mr. Ricci's knowledge. She testified: "At the time we were taking care of one of the children and my husband was working three days a week and I was expecting another child by Mr. Ricci at that time and I didn't think he should have the responsibility of another man's child. When he [Salemno] had come in and signed it away I didn't think Mr. Ricci should have the responsibility of the child." Shortly after the mother executed the surrender she repented her action and, with her husband's cooperation after he learned what she had done, thereafter did everything she believed necessary to regain the possession of the child. It cannot be said that she factually or legally abandoned it. There is nothing improper or unusual in having entered into the agreement whereby she and Salemno, the father, respectively undertook the support and custody of one of their children: see *Commonwealth ex rel. Haller v. Hanna,* 168 Pa. Superior Ct. 217, 77 A. 2d 750, affirmed *Per Curiam* in 367 Pa. 592, 81 A. 2d 546. During the subsequent happenings where appellants would censure the mother's conduct, it is apparent she

was under severe economic stress and emotional strain.

In their argument on the merits appellants pointed to testimony of experts called by them that a transfer of custody from the foster parents to the mother would cause a shock adversely affecting the child. It may be conceded that any change of environment causes readjustment by a child which is undesirable, but such change is not a controlling factor. It is present in every case where a change of custody is determined to be for the best interests of the child. Each case must be considered under its own circumstances.

It appears from the record in proceedings subsequent to the opinion and order of the court below, that the child has now been with its mother and sister for a considerable period of time, and a reversal of the lower court would compel another transfer of custody from the mother to the foster parents. However, our decision is based on the situation which confronted the lower court at the time it made the order complained of. Under all the facts and circumstances of this case, with full consideration given to the effect of the necessitated change of environment from the home of the foster parents to that of the mother, we would have arrived at the same conclusion reached by the lower court had we in the first instance been charged with the duty imposed upon it.

Judgment affirmed.

---

DISSENTING OPINION BY MR. JUSTICE LADNER:

While I concur in so much of the majority opinion as discusses the nature of the review on an appeal to the Superior Court, I dissent from the affirmance of the judgment of the court below because I deem it for the best interests of the child under the circumstances present in this case to allow the appellants to adopt the child. I would therefore reverse the judgment.