Commonwealth ex rel. Edinger *v.* Edinger.

Argued May 27, 1953. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY and MUSMANNO, JJ.

Appeal, No. 24, reargument refused August 3, 1953.

*Arthur Berman,* with him *Samuel Handler and Compton, Handler & Berman,* for appellant.

*I. E. Meyers,* with him *Solomon Hurwitz* and *Hurwitz, Klein, Meyers & Benjamin,* for appellees.

OPINION BY MR. JUSTICE MUSMANNO, June 26, 1953:

This case involves a contest between two parents for the custody of their two sons, Vance Edinger, Jr., now 8 years of age, and Richard Earl Edinger, 6 years of age. At present the children are with their father, Vance Whitney Edinger, Sr., at the home of their paternal grandparents, John Albert and Edna Edinger, each 61 years of age, on Round Top, a mountain near Elizabethtown, Pennsylvania.

The mother, Betty Jane Edinger, the relatrix here, age 31, lives with her mother, 54 years of age, at 47 Rupp Street, Middletown, Pennsylvania.

The sorrowful drama of any conflict between mother and father for the exclusive possession of their common progeny is emphasized in this case by the fact that the mother was at one time confined to a mental hospital. It is on the shadow of that awesome event that the father builds his claim that she is now incompetent to rear their offspring.

The warmth of mutual attachment which brought about the wartime marriage between the relatrix and respondent apparently cooled when the war ended, for in 1946, while Mrs. Edinger was enceinte with her second boy, relations between husband and wife were already strained. Quarrels, name-calling and budgetary difficulties rent the serenity of their home and divorce proceedings loomed.

In the latter part of 1946, Mrs. Edinger's father died of a heart attack. The shock of his sudden demise, coupled with her domestic infelicity, caused Mrs. Edinger to give premature birth to Richard, and illness followed. On June 10, 1947, she was admitted to the State Hospital in Harrisburg and remained there until February 11, 1948. After a temporary sojourn at home, she was returned to the hospital on March 9, 1948 where

she continued to receive insulin and electric shock treatments. On October 25, 1948, she was discharged from the hospital and since then has received no medical treatment of any kind.

Since her husband had taken away the children, Mrs. Edinger returned to the field of employment and obtained a job within two weeks after leaving the hospital. Later she took and passed a civil service test and entered the Government service. She is now employed in the military department of the Government at the Middletown Airport in the capacity of Special Order Clerk. As evidence of the confidence her superiors placed in her reliability she was sent for a period to Newark, New Jersey as a supervisor over typists preparing for overseas duty.

Dr. Hamblen C. Eaton, clinical director of the Harrisburg State Hospital, testified at the habeas corpus hearing before Judge WALTER R. SOHN of the Court of Common Pleas of Dauphin County, as follows: "I would say, on the basis of what I saw and when I talked to her, and what I have seen this morning on the stand, she has regained a state of emotional stability that I didn't believe was possible in the fall of 1948. As I saw her a month ago and as I see her today, I think there would be no risk in her taking the children at this time. We always have the problem in any case where we had mentally ill patients, of not knowing what the future holds. But if I had to answer it, is she particularly able to look after the children today, I would say yes."

To the question as to whether she would be a safe risk to have sole and exclusive custody of the children he replied: "I think I could answer yes on a question of that sort, as I see her today. No one of us knows what stress we are going to meet tomorrow, I don't have a crystal ball here."

Dr. Herbert E. Heim who signed the commitment papers in 1947 testified, after noting Mrs. Edinger's condition in the courtroom, "Frankly, I would find it hard to recognize the same person."

The lower court awarded the children to Mrs. Edinger, but her husband appealed to the Superior Court which reversed the Court of Dauphin County. Judge Reno of the Superior Court did not agree with the decision of the majority and in his dissenting opinion, in which he was joined by Judge Ross, he said: "The evidence has firmly persuaded me that appellee has completely recovered. Her employment record is tremendously significant. Starting in 1949 at $2450 per annum in a civil service position, she has been promoted four times and now receives $3030. Add to this, only those portions of the testimony of the experts quoted by the majority (disregarding the huge mass of other indubitably favorable evidence in the record), and you have incontrovertible proof that this mother now has absolute control of her mental faculties. Of course, the experts would not venture a prediction, not any more than this dissenter's physician will guarantee continued physical or mental health beyond several hours after an examination. If this Court waits until a reputable physician categorically certifies that appellee will never experience a recurrence of her ailment, it will wait forever and a day. Meanwhile, her children will be in the custody of a father whose fitness is questionable.

I would affirm the order of the court below upon the impressive opinion of Judge Sohn."

It would indeed be a tragic development in the law and in the spirit of man if the impression were generally to prevail that once a mother has passed through the doors of a mental institution she may never have the full companionship of her children again.

Today modern science and society take a view of mental trouble quite different from that which prevailed down through the ages. In the ancient days victims of cerebral disorders were regarded as subhuman; they were assumed to be possessed of the devil and devoid of spirit, feeling and the sensibilities of man; they were ostracized from community life. But time has opened the eyes of the sensible world and it is now recognized that a malady of the brain, so far as spirit and morals are concerned, is no different from a disease of the liver, except where dethronement of reason withdraws control over sensory and muscular control. Only recently the brilliant Broadway playwright and director, Joshua Logan,[1] related quite candidly on a nation-wide television program the story of his temporary confinement to a mental hospital and offered encouragement, based on his own experience, to others similarly disturbed.

Some mental ailments perhaps are incurable just as some physical diseases seem to be beyond the cure of scalpel and medicine, but there is no suggestion in this case that Mrs. Edinger strayed so far from the path of sanity that she could never return. On the contrary, it has been established that her deviation from the pattern of normality was transitory and born of wounds of sensibility which time and distance have apparently healed.

The Superior Court laudably sought for a guarantee of permanent recovery and, failing to find it in the printed record, reversed Judge SOHN, but the hearing Judge was in a superior advantageous position to evaluate the possibilities and probabilities of the case. He saw the parties and witnesses, and heard them. He

---

[1] Connected with numerous stage successes such as *South Pacific, Mr. Roberts, Wish You Were Here, Picnic,* etc.

had an opportunity to talk with the children themselves. The Superior Court said in the case of *Com. ex rel. Knouse v. Knouse*, 146 Pa. Superior Ct. 396, 398: "In this type of case we have recognized that weight is to be given to the fact that the parties are likely to be known to the lower court, and that it has had a better opportunity to pass upon their ability and character than we have. Com. ex rel. Witte v. Witte, 80 Pa. Superior Ct. 397; Com. ex rel. Bentley v. Bentley, 108 Pa. Superior Ct. 132, 136, 165 A. 44."

The parties will remain within the jurisdiction of Judge Sohn's court, so that if, despite all favorable prognosis, Mrs. Edinger should manifest symptoms of possible relapse, the doors of the Court of Common Pleas will always be open for the attainment of such action and relief as the circumstances require.

In *Commonwealth ex rel. v. Daven*, 298 Pa. 416, 419, a custody case, this Court said: "The cardinal consideration is ever the welfare of the child, which includes its physical, intellectual, moral and spiritual well being. To this the rights of parents and all other considerations are subordinate."

It is argued in behalf of the respondent-father that his sons are much better off in their present location than they would be in the home of the mother. It is undoubtedly true that the father's residence, which is really the domicile of his 61-year old parents, offers something that is attractive to young lads who have their private rooms in an 8-room frame house located on five acres of ground, with a fish pond, swing and sand box. The property, however, is somewhat isolated from urban life, located on a mountain, and is serviced only by a country school of the one-room schoolhouse type.

Mrs. Edinger lives with her mother, Mrs. Susan J. Sohn, in an urban community with a modern school

building, housing all grades from 1st to 9th, only two blocks away. Although Mrs. Sohn's house is not as large as the one at Round Top, it is modern, adequate, and the two boys would have a large bedroom to themselves. Home for home, we do not see how the children would suffer in physical comfort in either place. The lads might regret leaving behind them the fish pond, the swing and sand box, but a sand box is a device for infants and both Vance and Richard are now beyond the sand box age; swings they will find in abundance in the playground of the Middletown School yard; and, so far as the fish pond is concerned, life itself is a fish pond. But whatever they may lose in the fish pond of Round Top they will find in the fountain of mother's love and care in Middletown.

The law of Pennsylvania has definitely accepted the mother's right to the custody of her offspring. Writing for the Superior Court in the case of *Com. ex rel. Haller v. Hanna,* 168 Pa. Superior Ct. 217, Judge Ross said: "It is well settled in Pennsylvania, ever since the case of Com. v. Addicks, 5 Binney 519, that unless compelling reasons appear to the contrary, a child of tender years should be committed to the care and custody of its mother who, in the common experience of mankind, is better fitted to have charge of it, though there are cases where the contrary appears."

In *Com. ex rel. Luchetti v. Luchetti,* 166 Pa. Superior Ct. 530, Judge Hirt said: "Although a mother's right to custody is not absolute, courts have always recognized the propriety of committing a child of tender years to its mother."

It would be tragic if little Vance and Richard Edinger were to develop into youthhood and manhood deprived of a mother's solicitude, devotion and protection. What a mother's care means to her children has been so much romanticized and poetized that its sub-

594

stance has sometimes been lost in the flowers of rhetoric, in the aureole of song, and in the vivid color and glistening marble of painting and sculpture. A mother's care means instruction in religion and morals, it means the inculcation of patriotism and love of country, it means the maintenance of a clean heart, it means the imparting of lessons on duties in citizenship, courtesy and good will to one's fellow-man, it means the practical things of preparing healthful food and the mending and repair of clothing, it means ceaseless vigil and the balm of the healing hand when fever visits and the virus strikes—it means all these things and a million others, from all of which the child grows up resolved that he may never be unworthy of the lessons learned at the knee of his most loving companion, his best teacher, his most devoted defender, and his greatest inspiration for this and the life to come, his blessed mother.

The order of the Superior Court is reversed and the order of the Court of Dauphin County is reinstated, with costs on the appellees.