## Commonwealth ex rel. Staunton *v.* Austin, Appellant.

Argued September 16, 1966.   Before ERVIN, P. J.,
WRIGHT, WATKINS, MONTGOMERY, JACOBS, HOFFMAN,
and SPAULDING, JJ.

*William F. Fox,* with him *William T. Nicholas,* and
*Fox, Differ, DiGiacomo & Lowe,* for appellant.

*Edward F. Kane,* with him *Bean, DeAngelis, Tredin-
nick & Giangiulio,* for appellee.

OPINION BY HOFFMAN, J., November 17, 1966:
This is an appeal from an order of the Court of
Common Pleas of Montgomery County awarding cus-
tody of four-year old Christina Staunton to her parents
Thomas P. Staunton and Jean Campbell, also known
as Jean Staunton.   Mrs. Campbell will hereinafter be
referred to as Mrs. Staunton.

On January 24, 1948, Mrs. Staunton married Jo-
seph Campbell and lived with him until August 1951,
at which time they separated.   This marriage has not
been terminated by a divorce.

Since July of 1953 Mrs. Staunton has lived and co-
habited with Mr. Staunton in Philadelphia, Pennsyl-
vania.   Five children, including Christina, have been
born of this union.   The children range in age from
eleven to one and one half.

Christina was born on July 24, 1962, at the Osteopathic Hospital in Philadelphia. In October 1962, Mrs. Staunton suffered a severe post-partum depression which required that she be hospitalized. As a result, Mrs. Staunton sought the assistance of the Catholic Social Services of Philadelphia for the purpose of placing her children in foster homes. The three older children were placed in St. Mary's Home in Ambler, and Christina was placed with Mr. and Mrs. Roy Austin of Upper Merion Township. Thereafter, Mrs. Staunton was hospitalized at Wissahickon Hall, Philadelphia for four weeks.

In June of 1963, Mr. and Mrs. Staunton brought their four children together and resumed life as a family group. In September 1963, however, Mrs. Staunton again became very depressed and asked the Austins to accept Christina on a temporary basis.

Mrs. Staunton also requested that St. Mary's Home take her three older children a second time, but withdrew this request when she was informed that such a placement must be for a minimum of two years.

In January of 1964, Mrs. Staunton was hospitalized because of a miscarriage. In February of 1964, she was hospitalized at Wissahickon Hall for four weeks due to a mental depression and was then transferred to Mercy-Douglas Hospital where she remained until the middle of May 1964. During this period, the three older children were returned to St. Mary's Home upon Mrs. Staunton's consent to a placement of two years.

After her release from Mercy-Douglas Hospital, Mrs. Staunton cared for her mother during a protracted illness until August 24, 1964, when her mother died.

On February 4, 1965, a fifth child was born to Mr. and Mrs. Staunton. On February 16, 1965, Mrs. Staunton was hospitalized for almost one month, until March 13, 1965, with pneumonia.

On May 5, 1965, Mrs. Staunton contacted the Austins. She told them that she had just returned from her doctor who said that she was now well, and that she would like Christina to return home with her. The Austins refused her request, and this case has been the subject of litigation since that time.

The applicable rule of law in these cases was set out in *Commonwealth ex rel. Carpenter v. Carpenter*, 189 Pa. Superior Ct. 297, 299-300, 150 A. 2d 724 (1959). "Ordinarily, the needs of a child of tender years are best served by the mother, who is better able to care for them. . . . Unless compelling reasons appear to the contrary, a child of tender years should be committed to the care and custody of its mother. . . . This is true although others who have been suitable custodians of the child have become attached to it. . . .

"However we recognize that 'It is basic and fundamental that the paramount consideration is the welfare of the children and that all other considerations, including the rights of parents, are subordinate to the children's physical, intellectual, moral, spiritual and emotional well-being. . . . Such determination could supply the compelling reasons to overcome the principles usually applied.' "

This rule is the same for illegitimate children. *Albee Appeal*, 189 Pa. Superior Ct. 370, 150 A. 2d 563 (1959).

In the instant case it appears that both the Staunton and Austin homes are clean, carefully maintained and fully suitable for raising a young child.

Furthermore, it is undisputed that the Austins have been affectionate custodians for Christina. They have provided her with a full measure of love and solicitude. This alone, however, does not constitute sufficient reason to deprive a mother of her custody. *Commonwealth ex rel. Haller v. Hanna*, 168 Pa. Superior Ct. 217, 77 A. 2d 750 (1951), aff'd 367 Pa. 592, 81 A. 2d 546

(1951). The single question for us to determine is whether compelling reasons have been presented in the record which would render inapplicable the usual rule that a child of tender age should be in the custody of the natural mother.

The Austins contend first that Mrs. Staunton has shirked her obligations toward her child, and, in a sense, has abandoned it.

After a careful review of the record, however, we agree with the lower court that, "In spite of Mrs. Staunton's preoccupation with illnesses and pregnancy between September of 1963, the date of Christina's placement with Mr. and Mrs. Austin, and May of 1965, the date of this proceeding, she kept in touch with Mrs. Austin by phone, and made some unsuccessful efforts to visit Christina in the Austin home. She did not, under the foregoing circumstances, abandon Christina. . ."[1]

Moreover, this case is wholly unlike *Commonwealth ex rel. Ruczynski v. Powers,* 206 Pa. Superior Ct. 415, 212 A. 2d 922 (1965), aff'd 421 Pa. 2, 219 A. 2d 460 (1966), in which the natural mother twice relinquished custody of the child without good reason and, at the same time, executed a formal consent to adoption. In the instant case, it is clear that Mrs. Staunton was relinquishing custody of her child only because she was undergoing a very trying emotional and physical crisis; she was not shirking her responsibility as a mother. This fact is further demonstrated by Mrs. Staunton's attempts to retrieve her children from both the Austins and St. Mary's Home soon after she recovered.

---

[1] In addition to the telephone calls and visits, the testimony of both parties reveals that in 1963, Mrs. Staunton asked Mrs. Austin if Christina might be allowed to return home for a short visit during Christmas so that she might be with her brother and sisters. This request was refused by Mrs. Austin.

Furthermore, the testimony at the custody hearing fully established that the Austins were aware that Christina was being entrusted to their care on a temporary basis only. Mr. Austin specifically stated that when Christina was turned over to them on the second occasion, they did not feel that Mrs. Staunton was giving the child to them on a permanent basis but understood, rather, that the day would come when they would have to give her back to the Stauntons. Cf. *Commonwealth ex rel. Cummings v. Nearhoof*, 141 Pa. Superior Ct. 581, 15 A. 2d 529 (1940). We conclude, therefore, that Mrs. Staunton never intended to avoid her responsibilities as a mother, but that she relinquished custody only temporarily because of her unfortunate circumstances.

The Austins next suggest that Mrs. Staunton would be an unfit mother due to her history of mental illness.

Two psychiatrists testified at a hearing held on March 2, 1966. Dr. Peter D. Schindler stated that he had interviewed Mrs. Staunton on September 8, 1965 and concluded: "I do not feel . . . that Mrs. Staunton's needs are so great, however, that she has little or nothing left to give to others, that is, husband or children. I further feel that Mrs. Staunton could provide adequate emotional care of her children, assuming she remains well. During the interview Mrs. Staunton was pleasant, cooperative and concerned, and seemed in total remission from the symptoms and feelings resulting in the previous hospitalizations."

He stated further that drugs have been used successfully to keep people with depressive reactions out of the hospital and to bring them into a remission more quickly.

Dr. William W. Unangst testified that he had interviewed Mrs. Staunton on November 21, 1965, and again on November 25, 1965. He stated: "On the basis of these psychiatric interviews it must be concluded that Jean Staunton is not suffering from any overt emo-

tional illness at this time. Her background and her history would suggest that she might be mildly predisposed to depressive episodes, but as of this time, her emotional adjustment must be considered within the limits of normal."

Finally, a neighbor of the Stauntons, Marie McCollum, testified that in her opinion. Mrs. Staunton is a good housekeeper, that she is affectionate, and that she cares properly for her baby, Michael.

It is true, of course, that neither doctor predicted that Mrs. Staunton would never again suffer from mental depression. The Supreme Court of Pennsylvania recognized in *Commonwealth ex rel. Edinger v. Edinger,* 374 Pa. 586, 590, 98 A. 2d 172 (1953), however, that such predictions are rarely given, and, moreover that: "It would indeed be a tragic development in the law and in the spirit of man if the impression were generally to prevail that once a mother has passed through the doors of a mental institution she may never have the full companionship of her children again." See *Commonwealth ex rel. Beishline v. Beishline,* 176 Pa. Superior Ct. 231, 107 A. 2d 580 (1954) ; cf. *Commonwealth ex rel. Jacobson v. Jacobson,* 181 Pa. Superior Ct. 369, 124 A. 2d 462 (1956).

Judge (now President Judge) GROSHENS in the lower court was in a superior position to evaluate this case. He saw and heard the parties and their witnesses and found "evidence of restored health and stability." Under these circumstances, we conclude, as did the lower court, that Mrs. Staunton is sufficiently stable, both mentally and emotionally, to care for her child.

We recognize, as Dr. Unangst testified, that the uprooting of Christina from the home of the Austins at this time would undoubtedly be a shocking experience. To a certain extent, of course, this results from the protracted litigation for Christina's custody which has been in progress for over one and one half years. We

believe, however, that Christina will be more than compensated for the shock resulting from this separation by the benefits she will receive from the opportunity to grow up in a family unit composed of her natural parents, brothers and sisters. See *Commonwealth ex rel. Reese v. Mellors*, 152 Pa. Superior Ct. 596, 33 A. 2d 516 (1943).

Finally, mention should be made of the illicit relationship presently existing between Mr. and Mrs. Staunton.[2] Certainly, such a relationship is not to be condoned in our society. We believe, however, that the instant case presents unusual circumstances. We agree with the statement of Judge GROSHENS, in the lower court, that: "The illicit relationship of Mr. and Mrs. Staunton has proved to be a durable de facto relationship. Christina and her three brothers and sister are the product of the union. It seems to the hearing judge the cohesive force of Staunton family unit, as demonstrated through years of adversity, will prevail, and that Mr. and Mrs. Staunton and the children will probably enjoy a reasonably normal and satisfactory family life. The strong claims of close consanguinity are not to be denied in favor of strangers to the blood unless clear, certain and compelling reasons require such an unnatural result. . . . In spite of the impairment of the legal fabric of the Staunton family and the past illnesses of Mrs. Staunton which forced separations, the evidence of restored health and stability augur a better day for the family."[3]

Order affirmed.

---

[2] There is a suggestion in the record that Mr. Campbell has instituted divorce proceedings against his wife. Mrs. Staunton stated that when a divorce decree is entered she would marry Mr. Staunton.

[3] Special note should be made of the meticulous care and concern exhibited by President Judge GROSHENS in the lower court. The record clearly demonstrates the careful, sympathetic attention which he gave to both parties in hearing this case.

DISSENTING OPINION BY WRIGHT, J.:

The child here involved is now aged four years and three months. She was cared for by Mr. and Mrs. Roy Austin during eight months of the first year of her life, and has been continuously in the custody of the Austins since August 31, 1963. I feel very strongly that the permanent welfare of this little girl will best be served by not disturbing the existing custody arrangement.

The child's mother has a family history of mental illness. She has been hospitalized on three occasions for psychiatric treatment. Her marriage to Joseph Campbell has not been dissolved. The man with whom she is living in an illicit relationship was at one time entered in the alcoholic department of Saint Luke's Hospital. Indeed, the hearing judge made the following significant observation (172a): "We are dealing here with economic instability in this family. We are dealing with marital instability in this family, and we are dealing with mental instability in the mother. So you have three things that are disintegrating factors in human relationships".

By way of contrast, the Austins have provided the child with a comfortable abode, and with loving care and solicitude. They are responsible citizens. The child regards the Austins as her parents and their adopted daughter as her sister. She is happy and secure in the only home she has ever known. I would permit her to remain there.

WATKINS, J., joins in this dissent.