Commonwealth ex rel. Lucas, Appellant, *v.* Kreischer.

Argued December 8, 1971. Before WRIGHT, P. J., WATKINS, MONTGOMERY, JACOBS, HOFFMAN, SPAULDING, and CERCONE, JJ.

*Gailey C. Keller*, with him *Smith, Eves and Keller*, for appellant.

*Robert E. Bull*, for appellee.

OPINION PER CURIAM, March 24, 1972:
Order affirmed.

———

DISSENTING OPINION BY HOFFMAN, J.:
This is an appeal by the mother of three minor children from the order of the lower court awarding custody of the children to their father.

Three children were born of the marriage of the parties; Kelly, age 9; Rickey, age 8; and Tammy, age 6. In January, 1969, the parties separated and the chil-

dren remained with their mother for approximately three and one-half weeks. The mother, at that time, because she was unable to find a place to live, placed the children with their maternal grandmother in Columbia County, Pennsylvania.

In March, 1969, the parties agreed that the children should live temporarily with the paternal grandparents in Columbia County until either of the parties decided to bring the matter into court. In May, 1969, the father quit his job in Chester County and returned to Columbia County where he purchased a house trailer. The children then moved into his house trailer with him.

The mother was denied the right to see her children until September, 1969, when she received a phone call from the father advising her that he could not afford to take care of the children and that she should come and get them. At this time the mother was residing at her present address in Willow Grove, Montgomery County, Pennsylvania, with a black man whom she subsequently married in June, 1970, following the parties' divorce in January, 1970. The parties to this action are both white.

The children remained with the mother and her second husband until June, 1970. The father, although he remarried in January, 1970, made only two attempts to see the children until June, 1970, when he requested that he be permitted to have the children visit him for a week. The mother agreed to this request with the understanding that the father would return the children at the end of the period.

On June 13, 1970, the father took the children to his home in Columbia County, and he refused all requests by the mother to return them to her. From June, 1970, until the lower court's first order of January 25, 1971, the mother was permitted to see her children only four times. The father conditioned her visits on her

coming alone. During the visits the father did not allow her to take the children from the house nor at any time was she permitted to be alone with them.

The lower court, noting in its opinion that "there is little or no conflicting evidence in the record", found that the mother and her black second husband "are fit persons to have custody of children". The mother testified at the hearing below that she and her second husband "have a two bedroom apartment with a large living room, a dining area and a kitchen, an automatic dishwasher, garbage disposal, [and] bath." She also testified that the apartment was in "a nice neighborhood", and that if she received custody of her children she would move into an available "three bedroom apartment with the same type of accommodations" in the same apartment house.

It is apparent from the record that both parties are in similar economic circumstances, with both spouses in each family working and therefore requiring a babysitter during the day. Their situations would be identical except for two factors: (1) the mother of the children lives in a suburb of Philadelphia while the father lives in a more rurally oriented area (Berwick, Columbia County, Pennsylvania), and (2) the mother is married to a black man.

The trial judge considered the first factor, but did not find it significant: "[w]e believe it is logical to conclude that present day children in a good rural home have many advantages urban children do not have and the problems of growing up are greater in the city than in the country. This is a highly controversial issue, however, and is not conclusive one way or the other."

Having dispensed with the rural-urban issue, the lower court then approached the mother's interracial marriage: "[t]he second social sickness has existed for centuries and though some in-roads are being made

today, the almost universal prejudice and intolerance of interracial marriage is real and undeniable. This bias, however silly and unreasonable, is also exhibited toward the children [of interracial marriages]; and it must be admitted the plight of these children in the past has not been a happy one and in our opinion, this ancient phobia merits consideration in this case."

The trial court then concluded that the best interest and welfare of the children would be best served by leaving them with their father. The lower court made no mention of Pennsylvania's presumption that children of tender years should remain with their natural mother. *Commonwealth ex rel. Edinger v. Edinger,* 374 Pa. 586, 98 A. 2d 172 (1953). However, this rule of law is so well established, that it must be assumed that the court implicitly considered it and decided that prospective racial bias against the children of an interracial marriage would overcome the presumption.

I have carefully examined the record in this case and have found no indication whatsoever that the children were unhappy or that they were subjected to any bias, prejudice, or social injustice while they resided with their mother and her second husband. The conclusion of the lower court, therefore, must have been based solely upon the court's belief that the placement of the children in an interracial household would necessarily result in injury to their welfare. I cannot accept this conclusion of the lower court as correct either in fact or in law.

In recent years there has been a marked increase in the number of interracial marriages and trans-racial adoptions. See Marmor, *Some Psychodynamic Aspects of Trans-racial Adoptions,* published in *Social Work Practice, 1964,* Columbia University Press, New York, 1964. It is virtually a certainty that the number of interracial families will continue to increase in the near

future, as many adoption agencies and other social agencies are currently promoting trans-racial adoptions. Kenneth and Robert Knowlton, *Raising Kids from Seed and Seedling*, presented at the forty-fifth annual meeting of the American Orthopsychiatric Association, 1968.

All the sociological studies which I have found concern trans-racial adoption—the adoption of nonwhite children by white parents. These studies have shown that such families can function effectively and provide happy and healthy homes for the adopted children. *Mixed Race Adoptions*, the Open Door Society First International Conference, Address of Mr. Clayton H. Hagen, Supervisor, Adoption Unit, Lutheran Social Service of Minnesota, 1970. My research has disclosed no authoritative studies in the behavioral sciences which would indicate that a child in such an interracial household is subject to hurt or injury. *Cf. Potter v. Potter*, 372 Mich. 637, 127 N.W. 2d 320 (1964).

In the instant case, however, we have a different situation which involves the placement of white children with their natural mother and a black stepfather. I can find no reason why children placed with their natural mother and a stepfather of another race would be subject to any greater stress than children placed in a household with parents of another race. The considerations in the two situations are almost identical, and barring an actual showing that such placement would not be in the best interest of the children, the lower court's conclusion cannot be supported in fact.

The question of law which is presented in this case is a complex one which requires careful analysis. On the one hand is the Commonwealth's overriding interest in the welfare of children within its jurisdiction. On the other is the constitutional condemnation of virtually all racial classifications, except those which can be justified by a State showing that such classification is a public necessity.

I do not believe that either of these interests is subordinate to the other. It is apparent that a special rule must be created to govern the determination of custody where racial considerations are involved. To create an appropriate rule, it is first necessary to consider the constitutional dimensions of State attempts to regulate family structure by racial classification.

The question of whether a State could constitutionally forbid the adoption of a child by a parent or parents of different race has been considered only once in the reported cases. In the case of *In Re Gomez*, 424 S.W. 2d 656 (1967), the Texas Court of Civil Appeals held that a black man who had filed a petition for leave to adopt the two white minor daughters of his wife and had the petition denied because of a statutory prohibition against interracial adoption was entitled to adopt the children. The Texas court quoted from *Hamm v. Virginia Board of Elections*, 230 F. Supp. 156, 157 (U.S.D.C., E.D. Virginia, 1964), *affirmed*, 379 U.S. 19 (1964) : "The 'separate but equal' racial doctrine was condemned a decade ago in Brown v. Board of Education, 347 U.S. 483, 74 S. Ct. 686, 98 L. Ed. 873 (1954). Subsequent decisional law has made it axiomatic that no State can directly dictate or casually promote a distinction in the treatment of persons solely on the basis of their color. To be within the condemnation, the governmental action need not effectuate segregation of facilities directly. Cf. Anderson v. Martin, 375 U.S. 399, 402, 84 S. Ct. 454, 11 L. Ed. 430 (1964). *The result of the statute or policy must not tend to separate individuals by reason of difference in race or color. No form of State discrimination, no matter how subtle, is permissible under the guarantees of the Fourteenth amendment freedoms.* [Citations omitted.]" *In Re Gomez*, 424 S.W. 2d 656, 658-659 (1967) (emphasis added).

If a State cannot constitutionally legislate against interracial adoption in all cases, its courts cannot constitutionally permit the same result to be accomplished by judicial policy. In other words, a determination by a state court that interracial adoption in all cases was not in the best interests of the children and could not be allowed would be an impermissible state action within the meaning of the Fourteenth Amendment to the United States Constitution.[1]

The question then, narrowly defined, is under what circumstances may a State constitutionally consider the factor of race in denying custody of white children of tender years to their natural mother and black stepfather. The Appellate Court of Illinois was presented with circumstances very similar to those in the instant case in *Stingley v. Wesch,* 77 Ill. App. 2d 472, 222 N.E. 2d 505 (1966).

In *Stingley,* the white natural parents of the child had separated, and the mother, who had custody, remarried a black man. The natural father then sought custody by filing a petition for modification of the original decree. The lower court specifically found "that neither the mother nor the father are unfit persons and that both desire the custody of the child." Nevertheless, the lower court modified the decree and awarded custody to the maternal grandparents, who had also indi-

---

[1] This does not mean that all interracial adoptions would have to be approved. It means only that the factor of race, in and of itself, could not be determinative in all such cases. See the recent opinion in *Compos v. McKeithen,* U.S. (1972), where a Three-Judge District Court held the Louisiana adoption statute unconstitutional. There Judge CASSIBRY, writing for himself, Circuit Judge WISDOM and Judge MITCHELL, indicated that "we regard the difficulties inherent in interracial adoption as justifying consideration of race as a relevant factor in adoption, and not as justifying race as the determinative factor." *Compos v. McKeithen,* supra, at

cated their desire to have custody. The lower court explained its award by noting that it was in the best interest of the child "for his personal benefit and for social and economic reasons".

The Illinois Appellate Court noted that "modification [of a decree fixing custody] must be governed by the best interest of the child." *Stingley v. Wesch,* supra, at 476. It then reversed the lower court's award of custody to the grandparents and remanded the case for further proceedings to determine custody as between the parents, noting that "[c]learly, . . . [the] question of the race of the stepfather would have no significance in this proceeding."[2] *Stingley v. Wesch,* supra, at 477, citing *Fountaine v. Fountaine,* 9 Ill. App. 2d 482, 133 N.E. 2d 532 (1956).

The Illinois Appellate Court in *Stingley* did not reach the constitutional question, preferring to decide the case within the framework of Illinois family law. This produced a desirable result, but it did not create any standards to guide lower courts in their determination of custody in cases involving racial considerations. The federal courts, however, have considered the constitutional issue of racial classification many times, and their decisions are important to an assessment of the significance of the racial factor in custody determination. The United States Supreme Court in *McLaughlin v. Florida,* 379 U.S. 184, 192 (1964), noted "that the central purpose of the Fourteenth Amendment

---

[2] *Cf. Fountaine v. Fountaine,* 9 Ill. App. 2d 482, 133 N.E. 2d 532 (1956) ; and *Langin v. Langin,* 2 Ill. App. 3d 544, 276 N.E. 2d 822 (1971). These Illinois appellate decisions were filed in different districts than *Stingley v. Wesch,* supra, and hold only "that the question of race alone can[not] overweigh all other considerations and be decisive of the question." *Fountaine v. Fountaine,* supra at 486. The language in *Fountaine* appears to have been taken from Judge BAZELON'S opinion in *In Re Adoption of a Minor,* 228 F. 2d 446 (1955).

was to eliminate racial discrimination emanating from official sources in the States. This strong policy renders racial classifications 'constitutionally suspect', Bolling v. Sharpe, 347 U.S. 497, 499; and subject to the 'most rigid scrutiny', Korematsu v. United States, 323 U.S. 214, 216; and 'in most circumstances irrelevant' to any constitutionally acceptable legislative purpose. Hirabayashi v. United States, 320 U.S. 81, 100."

State action within the meaning of the Fourteenth Amendment includes not only the enactments of a legislature, but also the actions of the State's judicial officers. Therefore, the strict standard used to test the constitutionality of legislation classifying persons according to race is the same standard which must be applied to State judicial officers' actions which classify persons according to race. In the absence of a showing that the consideration of race in custody proceedings is *necessary* to the accomplishment of a permissible State policy, such a consideration would constitute an impermissible discrimination in violation of the Fourteenth Amendment. *McLaughlin v. Florida,* supra, at 196.

In *Loving v. Virginia,* 388 U.S. 1 (1967), the Supreme Court considered whether a State could constitutionally prohibit interracial marriage. The Court indicated that Virginia's power to regulate marriage was not unlimited: "[w]hile the state court is no doubt correct in asserting that marriage is a social relation subject to the State's police power, Maynard v. Hill, 125 U.S. 190 (1888), the State does not contend in its argument before this Court that its powers to regulate marriage are unlimited notwithstanding the commands of the Fourteenth Amendment. Nor could it do so in light of Meyer v. Nebraska, 262 U.S. 390 (1923), and Skinner v. Oklahoma, 316 U.S. 535 (1942)." *Loving v. Virginia,* supra, at 7.

The State of Virginia argued in *Loving* that the Supreme Court "should defer to the wisdom of the state legislature in adopting its policy of discouraging interracial marriages." *Loving v. Virginia*, supra, at 8. The Court rejected this argument: "[o]ver the years, this Court has consistently repudiated '[d]istinctions between citizens solely because of their ancestry' as being 'odious to a free people whose institutions are founded upon the doctrine of equality.' Hirabashi v. United States, 320 U.S. 81, 100 (1943). . . ."

"There is patently no legitimate overriding purpose independent of invidious racial discrimination which justifies this classification. . . . There can be no doubt that restricting the freedom to marry solely because of racial classifications violates the central meaning of the Equal Protection Clause." *Loving v. Virginia*, supra, at 11-12.

Furthermore, the consideration of race in *Loving* was held to have deprived the interracial couple of liberty without due process of law. In *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923), the Supreme Court stated that "[w]ithout a doubt, [the liberty guaranteed by the Fourteenth Amendment] denotes . . . the right of the individual to . . . marry, establish a home and bring up children." This was expanded upon in *Loving v. Virginia*, supra, at 12: "[m]arriage is one of the 'basic civil rights of man', fundamental to our very existence and survival. [Citations omitted.] To deny this fundamental freedom on so unsupportable a basis as the racial classifications embodied in these statutes, classifications so directly subversive of the principle of equality at the heart of the Fourteenth Amendment, is surely to deprive all the State's citizens of liberty without due process of law. The Fourteenth Amendment requires that the freedom of choice to marry not be restricted by invidious racial discriminations. Under our

Constitution, the freedom to marry, or not marry, a person of another race resides with the individual and cannot be infringed by the State."

Pennsylvania would clearly infringe upon the freedom to marry a person of another race and raise children if it allowed its judicial officers to decide the question of custody solely on the basis of the race of one of the parties. Divorced or unwed mothers would clearly be deterred from marrying an individual of another race by such a judicial policy because they would fear having their children taken from them, just as the children were taken from their mother in the instant case. Such a restriction on the freedom to marry and raise children, where no prospective harm to the children is indicated in the record, would deprive appellant and her husband of liberty without due process of law.

In the instant case the lower court, admittedly acting for the benefit of the children, indirectly restricted the right of the natural mother to have custody of her children because of her marriage to a black man. The constitutional question, then, is whether the Commonwealth's interest in promoting the children's welfare in this case is a "legitimate overriding purpose", or public necessity, which would justify the racial discrimination. *Loving v. Virginia,* supra.

It is clear that the Commonwealth's interest in promoting the welfare of children is very great, but, as indicated above, this interest must be balanced against the Fourteenth Amendment's prohibition of racial discrimination. It is for this reason that I believe a special rule must be created to determine the award of custody where racial considerations are involved. I would hold that a court could constitutionally consider race in custody cases only where racial abuse has been clearly shown in the record. However, where custody is denied solely on the unsupported belief that such

abuse will occur, the court's action would constitute an impermissible discrimination in violation of the Equal Protection Clause in the Fourteenth Amendment to the United States Constitution.

The lower court should be commended for its careful consideration of the delicate and complex issues in this case. It is evident that the court below did not intend to discriminate, and it specifically condemned racial bias in its opinion. However, the lower court thought that racial bias might at some time cause harm to the children, and it made its award for this reason.

In a multiracial society such as ours racial prejudice and tension are inevitable. If these children are raised in a happy and stable home, they will be able to cope with prejudice and hopefully learn that people are unique individuals who should be judged as such.

For the above reasons I would vacate the order of the lower court and remand the case for a determination of custody consistent with this opinion.

SPAULDING and CERCONE, JJ., join in this dissenting opinion.