## Commonwealth ex rel. Myers *v.* Myers, Appellant.

Submitted September 17, 1974. Before WATKINS, P. J., JACOBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and SPAETH, JJ.

*John McCrea, III, W. H. McCrea, Jr.,* and *McCrea & McCrea,* for appellant.

*Sylvia H. Rambo,* for appellee.

OPINION BY WATKINS, P. J., December 1, 1975:

This is an appeal from the decision of the Court of Common Pleas of Cumberland County awarding custody of two minor children to the father-appellee, Fred H. Myers. The children in question are Kelli, aged two; and Stacey, aged five.

The husband, a member of the United States Air Force, for ten months prior to January 14, 1974, had been stationed in Korea. His wife occupied a mobile home outside Shippensburg to which he returned on January 14, 1974. He then learned that, during his absence, the appellant had been romantically involved with one Thompson. This caused a separation; his wife remained in their mobile home until February 11, 1974, when she and the children left and moved into an apartment with Thompson, where she resided until the time of the hearing. She stated that Thompson moved out of the apartment a few days before the hearing, admittedly on advice of her counsel. At the hearing, the wife stated she would terminate her relationship with Thompson, with whom she admitted being in love, until she obtained a divorce from the appellee, and that she had filed for divorce the morning of the custody hearing. Additionally, it appeared that the appellant and Thompson had both signed the lease for the apartment they occupied after February 11, 1974.

On these facts the hearing court awarded custody to the natural father, even though it would involve

removal from Pennsylvania to the father's station in Mississippi. Actual custody pending appeal, was given to the paternal grandparents in Shippensburg.

The controlling principle here is the best interests of the children. *Commonwealth ex rel. Parikh v. Parikh,* 449 Pa. 105, 107, 296 A. 2d 625, 627 (1972). The "tender years" doctrine will not control where the mother is guilty of unchaste or improper conduct, detrimental to the welfare of the child. *Commonwealth ex rel. Likovich v. Likovich,* 220 Pa. Superior Ct. 202, 205, 287 A. 2d 156, 158 (1971).

The court below pointed out that the husband-appellee's displeasure ". . . had been heightened by the fact that the wife's paramour is a member of the Negro race", adding that its decision "is in no way related to that circumstance."

Appellate courts have become very reluctant to substitute themselves as "super Solomons" in custody matters when they have not had the opportunity to see and hear the witnesses and so properly determine credibility. It is difficult to find that the court below clearly abused its discretion under the circumstances of this case. If the mother-appellant does legalize her relationship with her paramour and establishes an acceptable home for the children as she testified she intended to do, she may then seek to have custody restored to her.

The order of the court below is affirmed.

———

CONCURRING AND DISSENTING OPINION BY SPAETH, J.:

As Judge HOFFMAN notes in his dissent, a court may not deny a parent custody of a child for reason of racial prejudice. *Commonwealth ex rel. Lucas v. Kreischer,* 450 Pa. 352, 299 A.2d 243 (1973). I am sure that the President Judge's opinion for the court accepts this principle. The issue, therefore, is whether, putting aside the evidence of racial prejudice, the evidence supports the lower court's award of custody.

In resolving this issue, the President Judge, citing the fact that we have not "had the opportunity to see and hear the witnesses," concludes that "[i]t is difficult to find the court below clearly abused its discretion . . . .," and therefore affirms. Judge HOFFMAN, however, after reading the same record concludes that it "simply does not support the [lower court's] conclusion . . . .", and therefore reverses. In my view, neither disposition is appropriate. I do not think the record shows that the lower court abused its discretion, and I therefore cannot join Judge HOFFMAN'S dissent. However, neither do I think the record sufficiently clear to warrant affirmance.

This case is comparable to *Commonwealth ex rel. Grillo v. Shuster*, 226 Pa. Superior Ct. 229, 312 A.2d 58 (1973). There too it was difficult to appraise the award of custody, because, although the hearing judge discussed some of the evidence, he had not discussed, or even referred to, certain parts of the evidence, which our examination of the record suggested might be decisive. In these circumstances, we found ourselves "uncertain what were the facts that persuaded the judge that it would be in the best interests of the children to award their custody to the father." *Id.* at 240, 312 A.2d at 64 (footnote omitted). We therefore remanded for further proceedings. That is what I think should be done here.

---

DISSENTING OPINION BY HOFFMAN, J.:

I dissent from the Majority's affirmance of the lower court's order granting appellee-husband custody of two minor children.

The appellee argued in his petition to the lower court that he was entitled to custody of his two daughters, Stacey, aged five, and Kelli, aged two, because ". . . the conduct of the mother, in this case, has been immoral, improper and unchaste . . ., and, . . . the admitted intentions of the mother to enter into an interracial marriage

will have severe emotional and psychological effects on the children."

In addition to the facts related by the lower court and the Majority, a review of the record reveals several important points. At the time of the initial separation of the litigants, they entered into an agreement prepared by the Judge Advocate's office of the Army War College, Carlisle, Cumberland County. The parties agreed that appellant would have custody of both children and that the appellee would be granted reasonable visitation rights. This agreement and the couple's separation occurred after the appellee had discovered that appellant had fallen in love and become sexually involved with another man during appellee's tour of duty in Korea. Thus, appellee entered into the agreement despite his knowledge that the appellant had committed adultery.[1]

Further, there was extensive testimony from appellant's and appellee's witnesses as well as from appellee himself that appellant was a fit and loving mother:

"Q. [by appellee's counsel] Now, Mr. Myers, as far as the general care and upkeep of these children, is it your opinion that your wife does take adequate care of their physical needs . . .?

"A. [by appellee] Yes, she does.

"Q. [by appellant's counsel] With the exception of what you have related, Mr. Myers, about your wife's involvement with Mr. Thompson and her residence with

---

1. "Q. You said that you found out that your wife was deeply involved with one Donald Thompson after you returned from Korea?

"A. Correct.

"Q. And subsequent to that time and that discovery, it is [sic] not true that you entered into an agreement with your wife, prepared by the Judge Advocate group . . . , in which you agreed that your wife should have custody of both children . . . ?

"A. That was without any knowledge that he was going to live with her."

him, with the exception of those facts do you believe your wife to be a good mother to the two children?

"A. [by appellee] Correct.

"Q. And does she care adequately and in fact quite well for their physical and emotional needs?

"A. Correct.

"Q. Are they quite attached, that is are the children quite attached to their mother?

"A. Kelli, yes, Stacey I think is closer to me than her mother."

"[By the Court] . . . He's indicated he felt she was a suitable mother except for her association with this man."

"Q. [by appellant's counsel] Does it appear to you that Mrs. Myers loves her two children and has a deep emotional attachment to them?

"A. [by appellee's mother] Yes.

"Q. When you are around does she pay attention, is she attentive to the children and does she indicate by word or conduct affection for them?

"A. Yes."

The appellee instituted the present action largely because he objected to his children being raised by an interracial couple, rather than because he believed his wife to be an unfit mother:

"Q. [by appellant's counsel] You've alleged that you believed continued presence of those two children with their mother and her paramour is detrimental and prejudicial to their best interests. May I ask you to be a little more specific about what the detriment and what the prejudice to their interest is that you see or believe?

"A. [by appellee] Well, from the time I was home until the time I left to go back, the whole time my children were very seldom around white people at all. The only time I even seen them they was all around black people and they have no confirmation of what white is, really, I don't think.

"Q. [by appellant's counsel] And how does the young one especially suffer by being around persons of a different race than hers?

"A. Well I can't really say how she would suffer but I mean it is hard when you come home and your own daughter don't know you, won't let you hold her or anything like that."

The lower court stated that "[i]n contests between parents for custody of their children, the best interests of the child are of paramount importance." I do not believe that this is the only issue involved in the instant case. "The question of law which is presented in this case is a complex one which requires careful analysis. On the one hand is the Commonwealth's overriding interest in the welfare of children within its jurisdiction. On the other is the constitutional condemnation of virtually all racial classifications, except those which can be justified by a State showing that such classification is a public necessity." *Commonwealth ex rel. Lucas v. Kreischer*, 221 Pa. Superior Ct. 196, 200, 289 A. 2d 202, 204 (1972) (dissenting opinion by HOFFMAN, J.), rev'd 450 Pa. 352, 299 A. 2d 243 (1973).

The Supreme Court's decision in *Kreischer* made clear that a court cannot deny a party custody of his or her children because that party is involved in an interracial marriage. The Court cited with approval from the dissenting opinion in this Court that " 'in a multiracial society such as ours racial prejudice and tension are inevitable. If . . . children are raised in a happy and stable home, they will be able to cope with prejudice and hopefully learn that people are unique individuals who should be judged as such.' " 450 Pa. at 356, 299 A.2d at 246.

Thus, in the instant case, the lower court could not properly grant custody to appellee on the ground that "the admitted intentions of the mother to enter into an

inter-racial marriage will have severe emotional and psychological effects on the children."[2]

The issue then is whether the mother's extramarital sexual relations are a sufficient ground to deny custody to the mother.

An extramarital affair is not per se grounds for denial of custody to one of the parents.[3] *Commonwealth ex rel. Gervasio v. Gervasio,* 188 Pa. Superior Ct. 95, 145 A. 2d 732 (1958). Appellee correctly points out that "flagrant and persistent" immorality is a basis to deny custody to a parent. *Commonwealth ex rel. Burke v. Birch,* 169 Pa. Superior Ct. 537, 83 A. 2d 426 (1951). The following is an instance of "persistent and flagrant" immorality: "[The mother] maintained a home at various places . . . where she regularly entertained numerous male visitors; she permitted an unmarried couple to stay there; she slept with certain of her male visitors; she left the children with teenage baby-sitters while she visited bars and taverns, where she consumed intoxicants, returning home as late as four a.m.; she encouraged drinking in her various homes; she permitted minors to drink there; she became pregnant and delivered a child in June, 1970, which she abandoned in the hospital for 49 days; and finally she left it with tavern owner, Carl 'Red' Barron, for adoption, refusing to name the father of the child; she became pregnant again in October, 1970, and was in

---

2. Appellee introduced no evidence other than the fact that Donald Thompson was black to justify the statement that severe emotional and psychological harm would be done to the children by living with Thompson.

3. A truly ironic situation might arise if adultery were a per se basis on which to deny a parent custody of his or her children. There is some evidence in the instant case that appellee was amorously involved with another woman during his stay in Korea. There are, no doubt, numerous instances in which both parents have been involved in extramarital affairs; nonetheless, a court must grant custody to one of the parties (in most instances) despite their extramarital sexual preferences.

that condition at the time of her divorce, which was procured by her husband in December, 1970, and at the time of the hearing in this proceeding; she has named a minor . . . as the father of this child and promises to marry him as soon as he reaches the age of 21; and his parents violently object to the marriage and sought to break up this relationship . . . ." *Commonwealth ex rel. Likovich v. Likovich,* 220 Pa. Superior Ct. 202, 203-04, 287 A.2d 156, 157 (1971). We reversed the grant of custody to the mother in *Likovich;* but even in so doing, we suggested that the mother at some future point might be sufficiently mature to merit the return of her children. Our Court views differently an extramarital relationship that is " 'not a trifling [one].' " *Gervasio,* supra, at 99, 145 A. 2d at 734.

In the instant case, appellant has separated herself from her lover, despite her intent to marry him if she is able to obtain a divorce. She has stated that her highest priority is the care and custody of her children. Although she works, she has made adequate babysitting arrangements for her children with one Mrs. Scott, also a mother of two children.[4] All of the witnesses agreed on one fact, that appellant is a loving mother who has always provided adequate care for her children.

The lower court feared that once custody was granted to appellant that she would resume cohabitation with her lover. Even if we were to conclude that continued cohabitation alone was a basis for denial of custody, custody proceedings are not final and the lower court

---

4. There is no doubt from the record that appellant has adequately arranged for the children's care during her working hours. Appellee's plans for the care of the children are not so clear. His mother has promised to accompany appellee and the two girls to Mississippi where appellee is stationed until some uncertain future date when he can make other arrangements. Obviously, his mother's stay cannot be indeterminate. Neither the lower court nor this Court can judge the adequacy of such uncertain plans.

could have conditioned its order on appellant maintaining a household separate from her lover. Cf., *Likovich,* supra, at 205-06, 287 A. 2d at 158: "Since matters of this nature are not constant or final and may be changed after hearing by the lower court, we have no hesitancy in reversing the order permitting the mother-appellee to retain custody and of awarding custody to the appellant-father, on condition that he maintains the child in the home of his parents until his return from Formosa or the circumstances of the parties change."

The record simply does not support the conclusion that the best interest of the two young children is served by separating them from their mother, an attentive parent whose contact with them has been continuous, while her husband has been absent from the family home.

Therefore, I would reverse the lower court's order and remand for further proceedings.