291 Pa. Superior Ct. 589 (1981)
436 A.2d 657
L.D.
v.
B.D.
Appeal of: L.D.
Superior Court of Pennsylvania.
Argued September 10, 1981.
Filed October 30, 1981.
*590 *591 Peter J. Verderame, Langhorne Manor, submitted a brief on behalf of appellant.
Jack J. Hetherington, New Britain, for appellee.
Before SPAETH, POPOVICH and MONTGOMERY, JJ.
SPAETH, Judge:
This is a child custody case. The lower court awarded custody of a boy, now five years old, to his mother. The boy's father has appealed. The lower court held a full hearing and filed a comprehensive opinion. We therefore accept the court's findings. We do not, however, accept the court's inferences from its findings, for in drawing those inferences, the court did not treat the parties equally but, rather, favored the mother. In our judgment, the facts, as found by the lower court, show that the father will be the better custodial parent. We therefore reverse and remand.
In custody cases the paramount concern is the best interests of the child. Commonwealth ex rel. Parikh v. Parikh, 449 Pa. 105, 296 A.2d 625 (1972); Commonwealth ex rel. Cutler v. Cutler, 246 Pa.Super. 82, 369 A.2d 821 (1977). Therefore, the scope of appellate review is not limited to determining whether the lower court has abused its discretion. Berman v. Berman, 289 Pa.Super. 71, 432 A.2d 1066 (1981). Instead, it is of the broadest type. In re Leskovich, 253 Pa.Super. 349, 385 A.2d 373 (1978). "Although we will not nullify the factfinding function of the hearing judge, we are not bound by deductions or inferences made by the lower court from facts as found." Davidyan v. Davidyan, 230 Pa.Super. 599, 603, 327 A.2d 145, 147 (1974). "We must exercise an independent judgment based on the evidence and make such an order on the merits of the case as right and justice dictate." Commonwealth ex rel. Pierce v. Pierce, 493 Pa. 292, 296, 426 A.2d 555, 557 (1981).
*592 Some of the facts are in dispute. In its opinion, however, the lower court states its appraisal of the credibility of the witnesses, Slip op. at 6-7, 13, 14, and we accept that appraisal. Most of the facts  at least, the essential facts  are not in dispute.
The parties were married in 1973. The father was 38 years old, the mother, 26. It was the father's first marriage, the mother's second. The mother's first marriage ended in divorce. She had three children by her first marriage; Sean, almost 17 years old at the time of the hearing before the lower court; Lisa, 15 at the time of the hearing; and Theresa, who was killed some five years ago in an accident. Peter, the subject of this dispute, was born April 8, 1976; he was a bit under five years old at the time of the hearing.
Before their separation, the parties and the three children lived in a three-bedroom home, where Peter shared a room with Sean. During most of the period at issue, the father worked during the week as a maintenance painter at Temple University and alternated working nights with the mother at a bar of which he was a co-owner. The mother has also worked, but after Peter's birth until the sale of the bar, in the Spring of 1979, she spent most of her time at home with the children.
In February 1977 the father's fifteen year old nephew, Paul, began living with the family. He "had gotten into trouble in California with drugs and forgeries," slip. op. at 4, and had come to live with the family at the suggestion of his probation officer, who thought that a new environment might contribute to his rehabilitation. Within two months of his arrival, the relationship between Paul and the mother developed into a sexual affair, "which continued on an off and on basis until several months before Paul returned to California in late 1979." Slip op. at 4. The father was unaware of the mother's affair with Paul until she told him about it during the summer of 1979; the father testified, without contradiction by the mother, that after disclosing her affair the mother told him she had become pregnant by Paul and had had a miscarriage. N.T. 1/15/81, 89.
*593 It is evident that the parties' marriage was destroyed by the mother's affair. The parties underwent counseling, but it could not restore the marriage. The mother testified that the father said he forgave her, but that "[h]e was very hurt," and although he tried, was unable to put the matter behind them. N.T. 2/24/81, 61. The father's testimony showed that he no longer trusted the mother. N.T. 1/15/81, 49.
The marriage was further damaged by an incident that occurred about March 1980. One night the mother brought home with her an 18 year old girl, named Debra, with whom she worked. The mother explained that Debra "had had a disagreement with her mother" and did not want to go home. N.T. 2/24/81, 55. Later that night the father heard noises coming from Sean's room, and upon investigating, discovered Sean and Debra engaged in sexual intercourse. The father became very upset, and the ensuing violent argument only ended with the arrival of the police and also, of the mother's father, who took the mother and all the children to his home until matters calmed down. After several days the mother and children returned.
However, the mother vacated the parties' bedroom and slept in the living room. N.T. 2/24/81, 93-94. Also, she started going out a good deal; she testified that she went "[p]robably twice a week" to a tavern, returning sometimes at 5:00 in the morning. Id. at 87-88. The record is not quite clear just when this started, but in any event, early in July she met John M. and they shortly became intimate. Within a few weeks they went on a camping trip together, and, the mother testified, by August they had had sexual relations. N.T. 2/24/81, 75.
About this time  the exact date does not appear of record  the father started an action in divorce. On August 1, 1980, while the mother was away, the father left the family home, taking Peter with him. He has since established a new residence at the home of Joseph and Carol Finnigan. Mr. Finnigan is a co-worker whom appellant has known for many years. The Finnigans have two children, David, 14 *594 years old, and Jennifer, 7. Also, Mrs. Finnigan's mother lives with them. Peter shares a room with David, while the father sleeps on the couch. Peter attends nursery school. Otherwise Mrs. Finnigan cares for him until the father comes home, between 4:30 and 5:30 in the afternoon. The father pays the Finnigans $80 a week and contributes "extras" such as babysitting services.
The mother, meanwhile, remains in the family home with her children. John M. is also living there. He is divorced, and he and the mother plan to marry as soon as the father's divorce becomes final.
It is fundamental to child custody cases that when the dispute is between the parents, there is no burden of proof; or, to put it differently, the parents share the burden equally. The question before the court is, "What is in the child's best interests?" The court must answer this question after examining all of the evidence, and without resort to the device, appropriate in many other sorts of cases, of imposing on one party or the other any burden of proof. Commonwealth ex rel. Spriggs v. Carson, 470 Pa. 290, 368 A.2d 635 (1977); Jon M.W. v. Brenda K, 279 Pa.Super. 50, 420 A.2d 738 (1980). In Re Custody of Hernandez, 249 Pa.Super. 274, 376 A.2d 648 (1977). Here, we have concluded, the lower court did not thus treat the parties equally. Instead, as we believe her opinion, when read in light of the record, shows the hearing judge favored the mother. This is best and most pertinently shown by the judge's handling of the evidence regarding the mother's affair with Paul  although there are other illustrations too, some of which we shall discuss.
With respect to the father, the lower court said:
We found father to be honest and found that he is very much concerned about his son, Peter, but full of hurt and anger over his wife's conduct which he regards as unforgiveable. He certainly has every reason to be hurt and angry but we cannot understand why he made no effort to supervise and guide his nephew whom he knew was sent into his care because of his misconduct in California. *595 From all the evidence presented he assumed no responsibility for his nephew.
Slip op. at 13.
With respect to the mother, the court said:
Mother appeared as a credible witness. She frankly but not blatantly admitted her sexual relationship with Paul and appears to have understood and to have attempted to assuage her husband's hurt . . . . She is outgoing and warm in her relationships. We do not condone in any way her affair with Paul. She certainly should have prevented it from starting and continuing but we can understand that she found someone with whom she could discuss things  something which she was unable to do with her husband.
Slip op. at 14.
We are unable to accept this allocation of responsibility. No doubt the father was at fault for not supervising and making an effort to guide Paul. The mother's fault, however, was far greater. She was as aware as the father of Paul's history. Moreover, since the father worked during the day, the responsibility for supervising the children was at least as much hers as the father's. Instead of supervising and making an effort to guide Paul, she proceeded to contribute to his delinquency. For the lower court to say that it could not understand the father's conduct, while it could understand the mother's, manifests such harshness to the father and sympathy to the mother as to demonstrate to us that the court did not treat the parties equally but, rather favored the mother.
The lower court evidently believed that the only significance of the mother's affair was whether it had had any adverse effect on Peter. Thus the court said:
Over objection of Mother's counsel, we permitted testimony from him [Paul] as to his relationship with Mother although it was remote only to determine if there had been any adverse effect on the child who was admittedly between the ages of eleven months and three years during the period in question.

*596 Slip op. at 6.
The court found that there had been no adverse effect  and we accept that finding  and cited cases holding that "the mere fact of a parent's non-marital relationship is insufficient to deny him or her custody of the children." G.J.F. v. K.B.F., 284 Pa.Super. 139, 425 A.2d 459 (1981) quoting Commonwealth ex rel. Myers v. Myers, 468 Pa. 134, 138, 360 A.2d 587, 589 (1976).
It was necessary, however, for the lower court to go further. For the significance of the mother's affair was not "only" whether it had had an adverse effect on Peter, but in addition, what it revealed about the mother's ability to be a good custodial parent for Peter.
It may well be, as the lower court said, that the mother is "outgoing and warm in her relationships," and needed "someone with whom she could discuss things." However, her decision to find an outlet, or comfort, in an affair with a 15 year old boy necessarily calls into question her emotional stability and maturity.
We are unable to share the lower court's appraisal of the mother's affair as "remote." The hearings before the lower court were in January and February 1981. As the lower court found, the mother's affair "continued on an on and off basis until several months before Paul returned to California in late 1979." Slip op. at 4. Moreover, the record indicates that the mother still does not accept the fact that it was her responsibility that there should be no affair. Thus she testified as follows:
Q. Tell the court who was the aggressor in this affair.
A. There was no aggressor. It's just something that happened.
Q. Something that happened between a 15-year-old and a 30-year-old; is that correct?
A. Maybe by age he was 15, but by other standards he was older than most people in this room.
N.T. 2/24/81, 103.
*597 In this regard, there appears to us to be an inherent inconsistency in the lower court's appraisal of the evidence. For while expressing its confidence in the mother, the court rejected the mother's favorable opinion of Paul, instead characterizing him as "a witness unworthy of belief as to most of his testimony," slip op. at 6, and pointing out that "[h]e had been involved with drugs in California and had forged checks which was why he was sent to Pennsylvania," id. As we have indicated, we have no difficulty accepting the court's appraisal of Paul's credibility. We do have difficulty understanding the court's confidence in the maturity of a woman who had an affair with such a rotter. In any event, if the court chose to be so understanding of the mother's conduct, it should have been equally understanding of the father's, much less troublesome, conduct.
Other aspects of the lower court's opinion illustrate the court's unequal treatment of the parties. The more significant of these are as follows.
The lower court criticizes the father for "[h]is lack of interest in establishing a relationship with his two stepchildren. . . .," Slip op. at 13, and suggests that "his total ignoring of them and their problems casts serious doubts upon his ability to guide his son as he develops," id. It is evident from the record, however, that the father's lack of relationship with his stepchildren is by no means all his responsibility. Whenever a marriage involves stepchildren, special understanding and considerable accommodation are required, by both adults. Here that was certainly so. The mother testified that "right from the very beginning of the marriage," Sean has had "a lot of resentment." N.T. 2/24/81, 30. Three years after the marriage she took Sean to a mental health foundation, where he went to a child psychologist for five or six months. Id. In addition, the parties have very different ideas about raising children, and the mother told the father that he was not to discipline her children nor concern himself with their affairs. N.T. 1/18/81 at 40; 2/24/81 at 85-86. An example of the mother's attitude appears when she was asked about the father *598 being "upset about seeing Debra in bed with Sean." The mother responded: "He shouldn't have opened the door, should he? He went into a closed bedroom door." N.T. 2/24/81, 85. We are sure that the relationship between the father, mother, and the children was difficult. We are equally sure, however, that the responsibility for this is shared by both parties. The father has clearly been extremely interested in the care of Peter and has involved himself in all aspects of his son's life, despite the heavy work schedule he has had to maintain. Whatever the degree of his fault in not developing a better relationship with his stepchildren, it does not, contrary to the lower court's suggestion, "cast[] serious doubts" on his ability to care for Peter.
The lower court also finds the father's current living arrangement to be makeshift. "While . . . convenient for Father, it does not show much initiative on his part to provide a true home for himself and his son." Slip op. at 14. The arrangement is certainly not ideal. However, evidently Peter enjoys a good relationship with Mrs. Finnigan  "Aunt Carol"  who does not work, and who, as already mentioned, cares for him when he is not at nursery school or home with his father. It is of course true that Peter is not with his stepbrother Sean and stepsister Lisa, but they are a good deal older than he is; moreover, when asked, "How do you get along with Sean?," Peter replied, "I just fight with him." N.T. 1/15/81, 119. While Peter still shares a room, David is closer in age to him than Sean, and they appear to get along. With regard to the father's lack of "initiative": Sleeping on a couch in the living room is no doubt uncomfortable for the father, but nothing suggests that it has any adverse effect on Peter. The father testified that he only planned to remain at the Finnigans' "until I pay some of my bills off." N.T. 1/15/81, 85. "[T]o provide a true home for himself and his son" would, it seems evident, be more expensive than being at the Finnigans' and would likely require hiring someone to care for Peter when he was not at school, and the father was at work. One must wonder how much of an *599 improvement for Peter such an arrangement would be. In any event, the problem was not so simple to solve, and the father's lack of initiative not so clear, as the lower court's comments suggest.
In its opinion the lower court states that "[w]e have also considered Peter's desire expressed on two separate occasions that he wanted to live with his Mother." Slip op. at 17. This likewise impresses us as oversimplification.
The first occasion was at the hearing on January 15, 1981, when the hearing judge asked Peter:
Q. Would you like to spend all day during the week with your mommy, and visit your father, your daddy on the weekend?
A. (Nods head affirmatively.) I like to live with my mommy.
Q. You would like to live with your mommy, and then visit with your daddy on the weekends, is that it?
A. (Nods head affirmatively.)
N.T. 1/18/81, 115.
No doubt encouraged by this response, counsel for the mother then asked Peter, "Who is your favorite person?," to which Peter responded, "My daddy." Id. at 119.
This second occasion was at the hearing on February 24, 1981. This time the court refrained from leading Peter. When Peter said, "I'd rather live with both of them," N.T. 2/24/81, 144, the court, carefully and gently, explained that "because of things between themselves that have nothing to do with you," that was not possible, and asked, "[I]f you have to make your choice, where would you like to be all week, and then where would you like to be on visits?" to which Peter responded, "Mommy," id. 144-45.
It was certainly appropriate for the court to question Peter. It is unfortunate, however, that on the first occasion, the questioning was so leading as to favor one of the contesting parties. In any event, given Peter's statement that his father was his "favorite person," and especially given his age  he was less than 5 years old; see Tomlinson *600 v. Tomlinson, 248 Pa.Super. 196, 374 A.2d 1386 (1977)  the lower court was unwarranted in giving any weight to what it understood to be Peter's preference to live with his mother.
Finally, we think it necessary to comment on the psychological evidence. The father called a psychologist, Carl A. LeFevre, Jr. By stipulation of the parties, the lower court admitted into evidence the written report of Jane E. Kessler, a psychological consultant attached to the court's Family Court Psychological Service; Ms. Kessler did not testify.
In its opinion the lower court states that Mr. LeFevre "appears to be well qualified." Slip op. at 16. The court summarizes Mr. LeFevre's opinion that the father "possesses many skills and qualities found in parents who offer stability, continuity, attention, affection, and age-related activities and parenting skills to a four year old child," and states, "We do not take exception to Mr. LeFevre's opinion that Father is able to parent a four year old . . . ." Id. However, the court states, it did "take exception that he recommends that custody be awarded to one parent without having had any contact with the other parent." Id. at 16-17. This criticism was entirely in order; given Mr. LeFevre's failure to interview and test the mother, the court was well within its discretion in substantially discounting his testimony. Moreover, as we have recently had occasion to emphasize, who should have custody of a child is a legal decision for the court alone to make, not for a psychiatrist or psychologist. Commonwealth ex rel. Grimes v. Yack, 289 Pa.Super. 495, 433 A.2d 1363 (1981).
Our difficulty with the lower court's opinion arises not from its criticism of Mr. LeFevre's opinion but from the fact that when it came to Ms. Kessler's report, the court appears to have suspended its critical faculties.
We assume that Ms. Kessler was qualified to express an opinion  although her qualifications do not appear of record, and we do not know what "psychological consultant" means. As we have mentioned, she did not testify. In considering her report, therefore, it was important to bear in mind that she was not required to explain it under cross-examination.
*601 Ms. Kessler saw the mother and father individually on October 7, 1980; the mother and father together on October 14; the mother and father with Peter on October 28; and spoke to the mother on the telephone on November 12. Her report  on which the lower court relied, characterizing it as "well stated," Slip. op. at 15  is highly critical of the father and very favorable to the mother. We find it at least as unimpressive as Mr. LeFevre's testimony.
Ms. Kessler states that the father's "chronic use of denial is a defense mechanism and his inability to be insightful causes him to feel that he has no psychological problems." According to Ms. Kessler, however, he "has two long-term personality disorders; he is both a compulsive personality and a dependent personality." Just what these "disorders" are, or indeed, whether psychologists are even agreed that they are disorders, and if they are, upon their definition, Ms. Kessler does not say. Nor does she say whether she submitted the father to any recognized psychological tests  as, it appears, Mr. LeFevre did  or if she did, what these tests were and what were the results. So far as appears from her report, the basis of Ms. Kessler's opinion of the father's personality was what she learned from the parties when she saw them individually and together.
Apparently the father was tight-lipped and stiff in his behavior. The mother, in contrast, evidently confided in Ms. Kessler,  and what she said appears to have been accepted uncritically and with a sympathy that we cannot distinguish from bias. After quoting the mother's statement to her that the father "was completely sexually inexperienced when she met him," Ms. Kessler adds: "Even after their marriage, he was only able to perform sexually under certain conditions. This contributed to their marital problems." Referring to the mother's affair with Paul, Ms. Kessler says:
According to [the mother], Paul provided the companionship that her husband did not give her, and their friendship later developed into a love affair. In my opinion, [the mother's] affair with Paul was not indicative of any chronic personality disorder or emotional instability on *602 [the mother's] part, but was simply one isolated reaction to an untenable marital situation.
These statements should not have been accepted without further inquiry; they beg for cross-examination. Had the mother in any way "contributed to [the parties'] marital problem?" Did her affair with Paul indicate no "emotional instability?" If the mother had no "chronic" personality disorder, did she have some other sort? Was her affair "simply" an "isolated reaction?" What does "reaction" mean? That the mother was not responsible for starting the affair? "Isolated," when the affair continued on an off and on basis for two years? And assuming the truth, and fairness, of the mother's characterization of the father as sexually inadequate, was it Ms. Kessler's opinion that that justified or excused the mother's affair with a 15 year old boy? Such a report, which may in fact not be biased but unexplained, appears to be, and which raises more questions than it answers, is not in our opinion "well-stated."
More might be said, not only about the report but other aspects of the record, and it might be said on either side. It is time, however, to state our conclusion.
In its opinion the lower court states that "Father has given an impression of rigidity which cannot fail to result in problems to his son." Slip op. at 13. Similarly, Ms. Kessler, the court's psychological consultant, states:
During our sessions [the father] demonstrated that he was a perfectionist, was preoccupied with rules and order, and insisted that others submit to his way of doing things. He showed a lack of awareness of the feelings elicited by his behavior.
We do not much differ with this appraisal. This case, it seems to us, involves, on the one hand, a rigid, puritanical father, and on the other, a self-indulgent, permissive mother. One way to state the issue is, not which parent's custody will better serve Peter's best interests, but which will do the lesser damage. This is a sour statement, and unfair to the extent that it implies any lack of love; we are satisfied that both parties love Peter, and want to rear him to be a fine *603 man. Moreover, who ever saw a custody case in which both parents were paragons? Or, for that matter, a panel of judges, all of them paragons? The parties, and Peter, and we, must take the facts as they are.
For all our misgivings, we believe the father should have custody of Peter. He has done nothing to shake our confidence in his ability to rear Peter comparable to what the mother has done, and while it might be better, his living arrangement with the Finnigans is adequate. The mother said that her life with John M. is "quite satisfying" (as Ms. Kessler's report quotes her). It may be  and it is to be hoped  that she will achieve a happiness and sense of security with Mr. M. that she has not so far enjoyed. (In this regard, it may be noted, the mother's father expressed the opinion that Mr. M. was better for the mother than the father had been, exercising an authority she needed, while at the same time showing her more love. N.T. 1/15/81, 130-33.)
Meanwhile, the matter will remain within reach of the lower court. A decision regarding custody is never final but may always be reviewed as circumstances require. In Re Custody of Phillips, 260 Pa.Super. 402, 394 A.2d 989 (1978); Friedman v. Friedman, 224 Pa.Super. 530, 307 A.2d 292 (1973); Commonwealth ex rel. Hickey v. Hickey, 216 Pa.Super. 332, 264 A.2d 420 (1970). Although in the end we have concluded that we must reverse the lower court's award, that implies no lack of confidence in the lower court. To the contrary. The lower court may be right. As we have said elsewhere, "we have no special wisdom that enables us to know better than anyone else what [custody] order right and justice dictate." Commonwealth ex rel. Berman v. Berman, supra, 289 Pa.Super. at 94, 432 A.2d at 1067. We must nevertheless do what our independent judgment requires.
Upon remand we expect that the lower court will, after a hearing, enter a visitation order. In the past there have been some difficulties about visits. Without saying more now, we simply note that we are satisfied that both parties *604 have contributed to those difficulties. We also note that the mother has expressed concern that the father will take Peter to Scotland or California. The lower court has ample resources to ensure that both parties will honor its visitation order, Davidyan v. Davidyan, 230 Pa.Super. 599, 327 A.2d 145 (1974), not simply because it is an order of the court but because it is in Peter's best interests that he maintain and develop a loving relationship with both his parents. Our order awarding custody of Peter to his father will not go into effect until the lower court enters its visitation order.
The order of the lower court is reversed. Custody of the child is awarded to his father, and the case is remanded for further proceedings consistent with this opinion.