295 Pa. Superior Ct. 1 (1982)
440 A.2d 1192
COMMONWEALTH of Pennsylvania, ex rel., M.B., J.B., and S.B.
v.
L.D.B.
Appeal of T.P.B.
Superior Court of Pennsylvania.
Argued October 26, 1981.
Filed January 22, 1982.
*2 David F. Pollock, Waynesburg, for appellant.
Steven R. Wolf, Canonsburg, for appellee.
Before SPAETH, HESTER and JOHNSON, JJ.
SPAETH, Judge:
This is an appeal by a father from an order awarding custody of his four children to their mother. During the second of the two hearings the father offered the testimony *3 of the family minister. On objection by counsel for the mother, the lower court held that under the new Divorce Code, Act of April 2, 1980, P.L. 63, Act No. 26, 23 P.S. § 101 et seq., the minister was precluded from testifying. The father argues that this was error.[1] We agree and remand for further proceedings.
The parties' four children are Michelle, born January 2, 1970; Jodi, born March 31, 1972; Stacy, born April 15, 1973; and Joel, born April 5, 1980. The first hearing was held on April 18, 1980. After the hearing, the lower court awarded custody of the children as follows:

ORDER
AND NOW, this 19th day of April 1980, the Court, believing the children's interest be better served, orders and directs now that the custody of Michelle, Jodi, and Stacy be immediately placed with their father, this custody placement to continue until the end of the school year, that custody under the supervision of Children and Youth Services and during that time, that agency to obtain and present to the Court of the home conditions in the home of Linda Demurray Bruno [the mother] and the home conditions in the home of Tom Bruno [the father] and it being the interest of the Court that as of the effective date, the closing of the school year, if the home conditions are satisfactory, that the children will be placed in the permanent custody of the mother.
Record at 17.
The order also provided for visitation by the mother and directed the father to pay support.
*4 As instructed by this order, caseworkers from Children and Youth Services visited the mother's home and the father's home, and reported to the lower court. On July 22, 1980, a second hearing was held. On November 14, 1980, the lower court issued an adjudication containing findings of fact and conclusions of law, and the following order:

ORDER
AND NOW, this 14th day of Nov., 1980, the Court orders that the custody of the children shall be placed with the mother, under the supervision of the Children and Youth Services of this County, and the custody transfer shall be effected during the second week of the Christmas holidays. The father shall thereafter have the right of in-custody visitation on the second and fourth weekends of each month, between the hours of six o'clock P.M. on Friday until six o'clock P.M. on Sunday, and also for one-half of the Easter vacation, each of the children's birthdays, and for two months in the summer, those two months being separated by a return of their custody to the mother for a week in between.
Counsel for the father filed exceptions to this adjudication. In response, on January 30, 1981, the court issued an opinion in which it corrected some of its findings of fact. The court declined, however, to change its conclusions of law, and in the order accompanying its opinion the court dismissed the exceptions to the conclusions of law and affirmed its award of custody to the mother.
Most of the testimony at the first hearing concerned alleged extramarital affairs of the mother. N.T. 4/18/80, 18-22, 27-33, 38-50, 62, 66-68, 72, 80, 95-99, 101-3, 112-13, 115, 120-123, 126, 127. We assume that this testimony was one reason for the lower court's order of April 19, 1980, placing the three oldest children  the youngest was only two weeks old  with the father until the end of the school year.
The mother denied most of the testimony regarding her alleged extramarital affairs. Nevertheless, in its adjudication, *5 issued after the second hearing, the lower court found that "[d]uring the course of the marriage the mother has had several extramarital affairs, and for several months before her separation, had been frequently identified with another man, and that relationship continued during and after her separation from the marital domicile." Finding of Fact No. 3. The court also found, however, that since the first hearing, the mother had "obtained better residence facilities," Finding of Fact No. 5, and that she had been "making a diligent effort to arrange for a home" for the children, Adjudication at 4. While finding that both parents loved and were capable of caring for the children, Finding of Fact No. 8, the court stated that
from a careful consideration of all of the ingredients involved, . . . [the mother] now is and will be better able to provide for their needs. She can give them full time care; has a closer bond with of [sic] confidence and understanding with them; can make the children feel more comfortable in her care; and is able to give them guidance and direction without the need for sitters and the father's harshness. It is the moral climate which we find to be most objectionable, and that especially as it relates to her continuing interest in a paramour, which at times, has preempted more of her interests and has dictated more of her decisions than has the children's welfare, and is therefore a matter which must still be better resolved.
Adjudication at 4-5.
The court concluded that "[t]he children's best interest is served by the placement of permanent custody in the mother, after the mid-year school brea[k], with ample visitation privileges in the father." Conclusion of Law No. 4.
In its opinion of January 30, 1981, in response to the father's exceptions, the lower court corrected some of its findings of fact, in particular stating that instead of "being on shift work" and on "somewhat irregular" hours, the father "works a steady day shift." Slip op. at 2, correcting Finding of Fact No. 7. The court declined, however, to *6 change its conclusion of law that it was in the best interest of the children to be in the mother's custody.
One of the father's exceptions was that
[d]uring the second hearing the Court erred in sustaining the defendant's [the mother's] objection to the testimony of Reverend Evans based on the non-existent counselor-client privilege.
In its opinion dismissing exceptions, the lower court did not discuss this exception.
During the second hearing, counsel for the father called the family minister, Reverend Evans, to testify on the father's behalf. Counsel for the mother requested an offer of proof, and the following exchange took place:
MR. POLLOCK: Your honor, Reverend Evans has participated in counseling of Mr. and Mrs. Bruno as was recommended by the Court since the prior custody hearing and as such would have some recommendations as to fruits of his counsel as to who would be the better parent or in hopes to enlighten the Court.
MR. KUSTURISS: I would submit to the Court, your honor, that this man, excuse me, I'm sorry, the Reverend from time to time had a confidential relationship with Mrs. Bruno. Is that correct, sir?
REV. EVANS: That is correct.
MR. KUSTURISS: And has talked to her in confidence long before this particular problem came before the Court. She had gone to him voluntarily in the past, that whatever information he has to offer here today is that which he got from talking to Mr. Bruno alone, that the report of the Child Welfare Office directed my client not to continue counseling with Reverend Evans for reasons stated in the report, I believe the Court has a copy of that report and based on that confidential relationship and based on all the factors involved in this case I don't feel it is proper for him to testify at this time. . . .
MR. POLLOCK: Well, your honor. . .

*7 MR. KUSTURISS: Just a minute, I am not done. . . . to make an opinion. In fact, I believe that his last statement is that he would not involve himself either way in this proceeding out of consideration he has had with both parties.
BY THE COURT: Your response to that objection?
MR. POLLOCK: Yes, your honor, in the state of Pennsylvania there is no confidential privilege extended between the relationship of a counselor to his client. Further more, as an extended part of our offer of proof we do not intend to ask Mr. Evans any questions he may have asked . . . any responses by Mrs. Bruno, but merely any recommendations he might have as a result of that and any insight he might give us into emotional stability on the part of either party.
N.T. 7/22/80, 194-196.
Before ruling, the court asked Reverend Evans, "I take it you have been in a sense, the family pastor for these folks for some time?", to which Reverend Evans replied, "That is correct, your Honor." Id. 200. The court further determined that since the first hearing, Reverend Evans had seen both parties "in a ministerial capacity"  the mother "several times" and the father "many more times than that." Id. The court's questioning of Reverend Evans continued as follows:
Q. If the question or questions were placed before you, Reverend Evans, by either counsel as to your opinion of the better setting of the children for permanent custody, would the answer to that question of necessity draw on information or identity of circumstances obtained in your counseling?
A. Your honor, I am not sure I could separate the information gathered in a formal counseling setting from the information gathered in the informal relationships. I am not sure I can sort that out and assure the Court that it would not be of a confidential nature.
Q. Reverend Evans, going beyond this case, this circumstance, will it, in your opinion lessen your effectiveness in *8 counseling where you understand that later you would be called and questioned concerning that counseling with respect to a case concerning custody between those parties?
A. Your honor, if it involved the question of confidentiality and revealing information received in a confidential counseling relationship, I believe it would be detrimental to the future counseling relationships with other people because I believe they would be hesitant in sharing in the counseling relationship if they knew that information could be recalled by the Court at a later date.
Q. At the time you were counseling these parties did you anticipate being called as a witness?
A. No, your honor. In the beginning all the counseling relationship, Mr. Kusturiss I believe it is, is correct. In the beginning of this counseling I indicated to both Mrs. Bruno and Mr. Bruno that I would rather be informal party who would be open to help both of them.

Id. at 199-200.
The court then sustained the mother's objection to Reverend Evans testifying. The court did not state the basis of its ruling, when it sustained the objection. However, in colloquy with counsel shortly before making the ruling the court said:
It is my understanding that the new divorce code which certainly does much to sponsor counseling does preclude the persons who are assigned to counsel parties from coming into Court and testifying . . . . In the Court's mind that [sic] he cannot testify as to anything that he received during a full counseling session with either of the parties.

Id. 197-98.
The lower court was correct in its understanding that the new Divorce Code does much to sponsor counseling. Specifically, the Code requires counseling in three situations:
(a) Whenever section 201(a)(6) [indignities] is the ground for divorce, the court shall require up to a maximum of *9 three counseling sessions where either of the parties requests it.
(b) Whenever section 201(c) [marriage irretrievably broken] is the ground for divorce, the court shall require up to a maximum of three counseling sessions where either of the parties requests it.
(c) Whenever the court orders a continuation period as provided in section 201(d)(2) [reasonable prospect of reconciliation], the court shall require up to a maximum of three counseling sessions within the time period where either of the parties requests it or may require such counseling where the parties have at least one child under 16 years of age.
23 P.S. § 202.
The Code also requires that the counselor submit a report stating whether the parties attended the sessions. 23 P.S. § 202(f).
In stating that the Code "preclude[s] the persons who are assigned to counsel parties from coming into court and testifying," the lower court no doubt had in mind Section 703 of the Code, which provides:
Communications of a confidential character made by a spouse to an attorney, or a qualified professional, shall be privileged and inadmissible as evidence in any matrimonial cause unless the party concerned waives such immunity.
23 P.S. § 703.
We are unable to agree with the lower court that Section 703 precluded Reverend Evans from testifying on behalf of the father. If we assume, without deciding, that Section 703 was designed to protect "the confidentiality of all communications between the qualified professional in the counseling sessions ordered pursuant to Section 202," Perlberger, Pennsylvania Divorce Code § 4.5 (1980), still, here the counseling sessions between the Brunos and Reverend Evans were not ordered pursuant to Section 202. Instead, as is evident from Reverend Evans's answers to the lower court's questions, the sessions began in March, which was *10 before the Divorce Code was enacted.[2] It follows that Section 703 could not preclude the testimony of Reverend Evans.[3]
Having concluded that the lower court erred in its reliance on Section 703, we must consider what remedy, if any, is appropriate. For if Reverend Evans's testimony was inadmissible for some other reason, the lower court's reliance on Section 703 would be harmless error, and no remedy would be required. It is possible that Reverend Evans's testimony was inadmissible. Two possibilities in particular occur to us.
First, it may be that the mother could preclude the testimony by invoking her privilege under the Act of July 9, 1976, P.L. 586, No. 142, § 2, 42 Pa.C.S.A. § 5943, which provides that "[n]o clergyman . . . who while in the course of his duties has acquired information from any person secretly and in confidence shall be compelled, or allowed without consent of such person, to disclose that information in any legal proceeding . . . ." Here, however, we cannot tell from the record whether counsel for the father intended to ask Reverend Evans to disclose any information acquired from the mother "secretly and in confidence."
Second, Reverend Evans's testimony might be an inadmissible expression of opinion. It is not clear whether counsel for the father was offering Reverend Evans as a lay witness or as an expert witness. As a lay witness, Reverend Evans would not be competent to express an opinion unless it were both rationally based on his own perceptions and *11 helpful to a clear understanding of his testimony or the determination of a fact in issue. Lewis v. Mellor, 259 Pa.Superior Ct. 509, 393 A.2d 941 (1978). As an expert witness, Reverend Evans would not be competent to express an opinion unless it pertained to a subject "so distinctively related to some science, profession, business or occupation as to be beyond the ken of the average layman," Ragan v. Steen, 229 Pa.Superior Ct. 515, 538, 331 A.2d 724, 736 (1974) (concurring opinion), and it appeared that the Reverend had "sufficient skill, knowledge, or experience in that field or calling as to make it appear that his opinion or inference will probably aid the trier in the search for truth." Id. See Kravinsky v. Glover, 263 Pa.Superior Ct. 8, 396 A.2d 1349 (1979) (no error in qualifying witness as expert in psychology with special focus on driving phobia similar to plaintiff's); Taylor v. Spencer Hospital, 222 Pa.Superior Ct. 17, 292 A.2d 449 (1972) (error not to allow nurse to testify about standards for restraints where she had experience). As the record stands now, we cannot tell whether the Reverend's proferred testimony would meet these requirements.
It appears from the transcript, however, that the lower court regarded Reverend Evans as an expert witness who was competent to express an opinion regarding what was in the children's best interest. Thus the court said:
Now, it does seem that a person of Mr. Evans' stature and position could relatively make certain recommendations to the Court, not by his confidences but from a purely professional standpoint.
N.T. 7/22/80, 197.
Although the record does not show it, this observation may well have been correct; that is, further questioning might have shown that Reverend Evans did have the knowledge of the parties and their children and the experience in counseling to be able to offer a helpful opinion regarding what would be in the children's best interest. Expert testimony, usually by psychiatrists or psychologists, is common in child custody cases. L.D. v. B.D., 291 Pa.Superior Ct. 589, 436 A.2d 657 (1981) (psychologist testified regarding father's *12 skills as parent; written report of psychological consultant submitted on mother's behalf); In re Breisch, 290 Pa.Superior Ct. 404, 434 A.2d 815 (1981) (dependency case; speech therapist testified about child's slow rate of speech development while in mother's care); Tomlinson v. Tomlinson, 248 Pa.Superior Ct. 196, 374 A.2d 1386 (1977) (letter from clinical psychologist regarding separation of children); In Interest of Clouse, 244 Pa.Superior Ct. 396, 368 A.2d 780 (1976) (letter from clinical psychologist regarding mother's emotional instability). But see, Commonwealth ex rel. Grimes v. Yack, 289 Pa.Superior Ct. 495, 433 A.2d 1363 (1981) (adoption case; denying remand for child psychiatrist's testimony). Moreover, we have repeatedly emphasized the importance in child custody cases of a complete record. Gunter v. Gunter, 240 Pa.Superior Ct. 382, 361 A.2d 307 (1976) (record did not contain transcription of child's preference); Commonwealth ex rel. Ulmer v. Ulmer, 231 Pa.Superior Ct. 144, 331 A.2d 665 (1974) (opinion did not discuss basis for decision or evidence); Commonwealth ex rel. Grillo v. Shuster, 226 Pa.Superior Ct. 229, 312 A.2d 58 (1973) (record did not reflect preference of children and opinion did not discuss weight given to certain factors in case where mother's virtue was focus of litigation). In some cases such testimony may be necessary to ensure that the record is complete.
Here the lower court's comments indicate rather plainly that the court wished to receive Reverend Evans's testimony, and would have received it but for the court's belief  which we have held was mistaken  that the testimony was precluded by Section 703 of the Divorce Code. The lower court's comments further indicate a concern  to be expected of a sensitive and conscientious judge  that the mother had not faced up to the fact that if she was to be able to care for the children properly, she would have to settle down.
In these circumstances, we have concluded that the best disposition is to remand for further proceedings. We are not persuaded that we should disturb the court's award of custody to the mother. On remand the lower court will be able to receive evidence of how the children have fared in *13 the custody of their mother, and of how the father and mother have been conducting themselves, and can enter an award accordingly.[4] If Reverend Evans's testimony is offered again, we hope this opinion will serve as some guidance to its admissibility.
The case is remanded for further proceedings consistent with this opinion. At the conclusion of these proceedings, the lower court shall enter a new custody order, accompanied by such explanatory opinion as is required by law. Any further appeal must be a new appeal, from that order. Meanwhile, the lower court's present order of custody shall remain in effect.
NOTES
[1] The father also argues that the lower court erred: (1) in finding that the mother's sexual misconduct was offset by the advantages to the children of being placed in her custody; (2) in giving too much weight to the children's preference to live with their mother; and (3) in giving too much weight to the fact that the mother, unlike the father, could remain at home all day with the children. We are not persuaded by these arguments, and shall not discuss them, both because the lower court's opinion adequately explains the basis of its award and because on remand the lower court will be enabled to reconsider the entire case.
[2] Mr. Bruno has brought an action in divorce, which is now before this court in another appeal. Bruno v. Bruno, (283 Pittsburgh 1981). At issue there is Mrs. Bruno's application that the new Divorce Code be applied to the action. However, nothing of record in that case or in the present case suggests that counseling was ordered incident to the divorce action, nor was a report filed by Reverend Evans, as he would have been required to do under Section 202(f) of the Divorce Code.
[3] Because of this conclusion, we do not decide any questions regarding the interpretation of Section 703, such as whether a witness's expression of an opinion is a "[c]ommunication[] of a confidential character," or whether a custody case is a "matrimonial cause."
[4] In determining the possible role of Children and Youth Services the lower court will wish to consider In re Custody of Frank, 283 Pa.Superior Ct. 229, 423 A.2d 1229 (1980).